INDEPENDENT ENERGY PRODUCERS
ASSOCIATION, INC., et al.,
Plaintiffs–Appellants,

v.

CALIFORNIA PUBLIC UTILITIES
COMMISSION, Defendant–
Appellee,

and

San Diego Gas and Electric Company;
Pacific Gas and Electric Company, et
al., Defendants–Intervenors–Appellees.

No. 92–16201.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 8, 1994.

Withdrawn from Submission
Feb. 11, 1994.

Resubmitted Sept. 15, 1994.

Decided Sept. 22, 1994.

Gordon P. Erspamer, Morrison & Foerster, San Francisco, CA, for plaintiffs-appellants.

Ellen S. LeVine, California Public Utilities Com'n, San Francisco, CA, for defendant-appellee.

Michael C. Tierney, San Diego Gas & Electric Co., Randall J. Litteneker, Pacific Gas & Electric Co., San Francisco, CA, John R. McDonough, Carlsmith, Ball, Wichman, Murray, Case & Ichiki, Los Angeles, CA, for defendants-intervenors-appellees.

Susan Tomasky, Jerome M. Feit, Eric L. Christensen, Washington, DC, for amicus curiae Federal Energy Regulatory Com'n.

Before: FLETCHER, KOZINSKI and TROTT, Circuit Judges.

FLETCHER, Circuit Judge:

Independent Energy Producers Association, Inc.,[1] Sithe Energies, Inc., and Destec Energy, Inc. (collectively "Independent Energy") appeal the district court's summary judgment in favor of the California Public Utilities Commission ("the CPUC") and Pacific Gas & Electric Co., San Diego Gas & Electric Co., and Southern California Edison Co. ("the Utilities"). Independent Energy brought this action in federal district court seeking a temporary restraining order to prevent the CPUC from implementing an order which delegates to the Utilities the authority to enforce federal operating and efficiency requirements set out in the Public Utility Regulatory Policies Act of 1978 ("PURPA") and in regulations promulgated by the Federal Energy Regulatory Commission ("the Commission").

Under Title II of PURPA, Congress designated for special treatment "qualifying cogeneration facilities" ("QFs")[2] that meet fed-

---

1. Independent Energy Producers Association is a membership trade organization composed of 42 firms that own or operate non-utility-owned electric generating facilities.

2. A cogeneration facility is a facility which produces both electric energy and "steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating, or cooling purposes." 16 U.S.C. § 796(18)(A). Because cogeneration reuses waste heat to produce additional energy, it is a particularly efficient method of generating electric energy.

eral operating and efficiency standards. PURPA and the federal regulations implementing it provide that public utilities are required to purchase electric energy from QFs at a rate that is equal to the incremental cost to the utility of purchasing or generating energy elsewhere. Independent Energy represents facilities that are QFs within the meaning of PURPA. Pursuant to federal law, the QFs and the Utilities entered into contracts for the sale and purchase of electric energy. These contracts contain standardized terms for the purchase and sale of electric energy and set the rates to be paid to the QFs for that energy.

In 1991, the Utilities and the CPUC devised a program which authorizes the Utilities to monitor the compliance with federal operating and efficiency standards of the QFs with which they have contracts. If a Utility determines that a QF does not meet federal operating and efficiency standards, it is authorized to suspend payment of the rates specified in the contract and to substitute a lower, "alternative" rate.

Independent Energy now challenges this program on the grounds that the Commission's authority to enforce PURPA's operating and efficiency requirements is exclusive and that the CPUC program is preempted by federal law. It contends that the CPUC program authorizes the Utilities to enforce PURPA's operating and efficiency standards, and thus represents a state intrusion into an area of exclusively federal regulation. The district court disagreed, and held that the CPUC program was not preempted by federal law. We have jurisdiction and we reverse and remand.

I

In order to understand the issues in this case, it is necessary to understand the structure of PURPA and the regulations promulgated thereunder.

A. *The Federal Power Act*

The Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.*, provides that any person who owns or operates facilities used to transmit or sell electric energy in interstate commerce at wholesale is subject to the jurisdiction and regulatory power of the Commission. 16 U.S.C. § 824(a) & (e). In 1978, Congress enacted PURPA, which amends the FPA. Title II of PURPA was enacted to encourage the development of cogeneration and small power production facilities, and thus to reduce American dependence on fossil fuels by promoting increased energy efficiency. To achieve this objective, Congress sought to eliminate two significant barriers to the development of alternative energy sources: (1) the reluctance of traditional electric utilities to purchase power from and sell power to non-traditional facilities, and (2) the financial burdens imposed upon alternative energy sources by state and federal utility authorities. *E.g., Federal Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 750–51, 102 S.Ct. 2126, 2132–33, 72 L.Ed.2d 532 (1982).

Section 201 of PURPA designates a group of facilities as QFs, which group includes any cogeneration facility that meets operating and efficiency requirements and ownership requirements prescribed by the Commission. 16 U.S.C. § 796(18)(B).

Section 210 of PURPA specifies the benefits to which QFs are entitled. It creates a market for their energy by requiring that the Commission establish regulations that obligate public utilities to sell electric energy to and purchase electric energy from QFs. 16 U.S.C. § 824a–3(a). Section 210(b) requires the Commission to promulgate regulations that ensure that the rates for these purchases "shall be just and reasonable to the electric consumers of the electric utility and in the public interest." However, these rates may not exceed the incremental cost to the utility of purchasing alternative electric energy. 16 U.S.C. § 824a–3(b). This incremental cost is defined as "the cost to the electric utility of the electric energy which, but for the purchase from such [QF], such utility would generate or purchase from another source." 16 U.S.C. § 824a–3(d).[3]

---

**3.** Section 210 also requires the Commission to promulgate rules exempting QFs from most regulations imposed under the Public Utilities Hold-

## B. *The Commission's Regulations*

In 1980, the Commission promulgated regulations pursuant to Title II of PURPA. 18 C.F.R. Part 292. These regulations are divided into two relevant parts: (1) Subpart B regulations define the operating and efficiency standards that cogeneration facilities must meet in order to qualify as QFs; and (2) Subpart C regulations define the benefits to which QFs are entitled.

Subpart B regulations, 18 C.F.R. §§ 292.-201–.211, deal with the requirements and procedures for determining QF status and describe the operating and efficiency standards that cogeneration facilities must meet in order to be certified as QFs. 18 C.F.R. § 292.205.[4] They also establish two means by which a cogenerator can register its status as a QF. Under the Commission's "self-certification" procedure, a cogenerator simply provides the Commission with information demonstrating that it is in compliance with operating and efficiency standards; under this procedure, no affirmative action by the Commission is required. 18 C.F.R. § 292.207(a)(2). Under the Commission's "optional" procedure, a cogenerating facility may apply to the Commission to obtain certification; under this procedure, the Commission must issue an order granting or denying certification within ninety days from receipt of the application. 18 C.F.R. § 292.207(b).

In addition, Subpart B regulations provide that the Commission may revoke QF status if the QF has failed to comply with the statements contained in its application for certification. 18 C.F.R. § 292.207(d). The regulations also provide that the Commission may waive operating and efficiency standards for

a cogenerating facility upon a showing that the facility produces significant energy savings. 18 C.F.R. § 292.205(c).

The second group of the Commission's regulations, Subpart C regulations, 18 C.F.R. § 292.301–.308, regulate the purchase of energy by utilities from QFs as required by § 210 of PURPA. They require that utilities purchase electric energy from and sell electric energy to QFs at the Utility's full "avoided cost" rate. 18 C.F.R. § 292.304(d). "Avoided costs" are a utility's incremental costs for electric energy or capacity which, but for the purchase from the QF, the utility would generate itself or purchase from another source.[5] 18 C.F.R. § 292.101(b)(6); *see also American Paper Inst. v. American Elec. Power,* 461 U.S. 402, 412–18, 103 S.Ct. 1921, 1927–31, 76 L.Ed.2d 22 (1983) (upholding the Commission's requirement that QFs receive full avoided cost rates, the statutory maximum under section 210). The regulations provide guidelines for the calculation of "avoided costs." The utility is required to submit data to the state regulatory agency, in this case the CPUC, which is considered by the CPUC along with other factors in calculating avoided costs. 18 C.F.R. §§ 292.-302(b)(2) & 292.304(e).

Subpart C regulations also provide that each QF has the option to sell energy on an "as available" basis or pursuant to a contract enforceable over a specified term. 18 C.F.R. § 292.304(d)(1) & (2). If electric energy is purchased pursuant to a contract, the rate for such purchases is based on either the avoided cost as calculated at the time of delivery, or the avoided cost as calculated at

---

ing Company Act and many state laws and regulations. 16 U.S.C. § 824a–3(e).

**4.** The Commission's operating standard provides that the cogenerating facility's annual useful thermal energy output (i.e. the energy that is used for an industrial or commercial purpose) be at least 5% of the total energy output. 18 C.F.R. § 292.205(a)(1). The Commission's efficiency standards require that a cogenerating facility use fuel efficiently and are calculated based on the facility's annual fossil fuel input, the useful thermal energy output, and the total energy output. *Id.* at § 292.205(a)(2)–(b).

**5.** Avoided costs include both energy costs and capacity costs. Energy costs are the costs associ-

ated with the incremental production of electric energy, including the cost of fuel and certain operating and maintenance costs. Capacity costs are the costs associated with providing the capabilities to meet the demand for electric energy. These costs may be incurred by a utility in order to build generating facilities, to institute conservation programs, or to purchase power on the wholesale market. *Administrative Determination of Full Avoided Costs, Sales of Power to Qualifying Facilities, and Interconnection Facilities,* IV Federal Energy Reg. Com'n Rep. (CCH) ¶ 32,457, at 32,157 (Mar. 16, 1988) [hereinafter *"Administrative Determination"*].

the time the obligation is incurred. 18 C.F.R. § 292.304(d)(2).

Finally, the Commission's regulations required the states to implement the Subpart C regulations. 18 C.F.R. § 292.401.[6]

## C. CPUC Implementation

Pursuant to this statutory and regulatory command, the CPUC initiated a process in the early 1980s to develop contracts under which QFs could sell electric energy to and purchase electric energy from utilities. In 1982, the CPUC adopted "standard offer" contracts, which contain standardized contract terms and establish the prices to be paid QFs for electric energy. Dec. 82–01–103, OIR 2, 8 CPUC 2d 20 (1982). The four contracts differ primarily in the length of the contract, the availability of capacity and energy from a QF, and the avoided cost rate payments corresponding to such availability.[7] The CPUC required that utilities offer these contracts to any QF desiring one. Id.

In accordance with federal regulations, the standard offer contracts provide the QFs a choice to receive avoided cost rates which are calculated at the time of energy delivery or which are fixed at the time the contract is signed. See 18 C.F.R. § 292.304(d)(2). The contracts at issue in this case provide that the avoided cost rate be fixed at the time the contract is signed. The contracts also contain express warranties that the QF will maintain and operate its facility in continued compliance with Commission regulations.

In 1985 and 1986, CPUC recognized that the avoided cost rates provided in standard offer contracts Nos. 2 and 4, which were calculated in part based on the cost of fuel needed to generate electricity, were higher than the actual avoided cost rates in 1985. In projecting future avoided costs at the time the contracts were executed, the CPUC had considered the anticipated cost to the utility of its own fuel sources, primarily fuel and natural gas, and had assumed that fossil fuel prices would continue to rise into the 1980's. Instead, these prices declined. As a consequence, the avoided cost rates provided in the contracts were higher than the then current actual avoided cost rate.[8] The CPUC has suspended the availability of these fixed price contracts for future contracts, but previously-signed contracts remain in effect.

## D. The CPUC Program

In 1991, the CPUC adopted the monitoring and enforcement program that gave rise to this action. Under this program, the CPUC authorized the Utilities to monitor the compliance of the QFs from which they purchase electric energy to ensure that they are in compliance with federal operating and efficiency standards. The program provides that if a Utility determines that a QF is not in compliance with operating and efficiency standards, the Utility is authorized to suspend payment of the avoided cost rate specified in the standard offer contract, and to substitute an "alternative" avoided cost rate equal to 80% of the Utility's avoided cost for short term economy power.

The Utilities are also permitted to collect from the QFs payments above the 80% "al-

---

6. This regulation was found at Subpart D of the Commission's regulations. It was recently rescinded as obsolete. *Eliminating Unnecessary Regulation*, 57 Fed.Reg. 21,730, 21,732 (1992).

7. For example, under one type of standard offer contract, the QF's electric energy and capacity are sold on an as-available basis, meaning that the amount and time of delivery of the energy are not guaranteed. Under a second type of standard offer contract, the QF's capacity is sold on a firm basis, meaning that the amount of capacity is guaranteed to be available to the utility during its peak load period. And under a third type of standard offer contract, the payment rates are fixed over a long time period based on forecasted avoided energy costs; for this third type of contract, rates may be based on capacity that is provided on either an as-available basis or on a firm basis. Generally speaking, firm rates are higher than as-available rates to reflect the higher value of energy and capacity delivered pursuant to a contractual obligation.

8. Apparently many states that developed fixed-price standard offer contracts encountered the same problem with their long-term, fixed-price contracts. *See Administrative Determination*, IV Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,-457, at 32,171–74. Recognizing that these contracts may obligate utilities to purchase QF energy at rates that are too high, the Commission suggested that states develop contracts that provide increased price flexibility but still provide a secure revenue stream to the QFs. *Id.* at 32,172–74.

ternative" avoided cost rate for any time period that the QF has not been operating in compliance with federal efficiency standards, retroactively for a period up to three years from the last date on which efficiency data was submitted. Finally, the Utilities are permitted to suspend parallel operation with any "non-complying QF" if the utility determines that continued parallel operation represents a burden to the utility or its customers.

E. *District Court Proceedings*

In 1991, Independent Energy brought this action seeking to enjoin CPUC from implementing the order. Independent Energy alleged that PURPA and the Commission's regulations grant the Commission exclusive jurisdiction over QF status determinations, and that the CPUC program is preempted because it intrudes on this area of exclusively federal regulation. It also argued that the CPUC program violates section 201 of the FPA, which grants the Commission exclusive jurisdiction over wholesale interstate electricity rates for non-QFs.

The district court granted summary judgment for the CPUC, holding that although the Commission has exclusive authority over the ultimate determination of QF status, the states may play a role in monitoring and enforcing compliance with QF requirements. The district court did not discuss Independent Energy's contention that the CPUC program violates section 201 of the FPA. Independent Energy timely appealed.

**II**

■ We review the district court's grant of summary judgment de novo. *Holman v. Laulo–Rowe Agency,* 994 F.2d 666, 668 (9th Cir.1993).

■ The Supremacy Clause of Article VI of the Constitution provides Congress with the power to preempt state law. "Preemp-

tion occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986) (internal citations omitted). Thus, preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983) (internal citations and quotations omitted). "Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 369, 106 S.Ct. at 1898–99.

■ Independent Energy and the Commission[9] agree that PURPA evinces Congress's intent that the Commission exercise exclusive authority over QF status determinations. The Commission's regulations carry out that intent. Both argue that because the CPUC program authorizes the Utilities to make QF status determinations, and thus to intrude into an area of exclusively federal regulation, it is preempted by federal law. We agree.[10]

■ The structure of PURPA and the Commission's regulations, reflect Congress's express intent that the Commission exercise

9. The court sought the Commission's views which are set forth in its amicus brief filed with the court.

10. Appellants argue in the alternative that even if the CPUC program can be characterized as a product of the CPUC's authority to calculate avoided cost rates and to oversee power pur-

chase agreements between QFs and utilities, it conflicts with the Congressional purposes behind PURPA and with the Commission's regulations regarding QF status determinations. Because we agree with appellants' first proposition, we do not reach this alternative argument.

exclusive authority over QF status determinations. Section 201 of PURPA provides that a QF is a cogeneration facility that *"the Commission* determines, by rule, meets such requirements ... as *the Commission* may, by rule, prescribe." 16 U.S.C. § 796(18)(B)(i) (emphasis added). PURPA's legislative history confirms that the Commission's authority to make status determinations is exclusive:

> The [definition of QFs] provide[s] that the Commission shall determine ... [that a] cogeneration facility is a ... qualifying cogeneration facility.... The purpose of this determination is to provide a means to insure that such a facility is identified *through Commission action* for purposes of showing that it is in fact included in any exemption under section 210(e) of [PURPA]. Such determination would also prevent such facility from being challenged concerning the application of such exemption to it.

H.R.Conf.Rep. No. 1750, 95th Cong., 2d Sess. 89, *reprinted in,* 1978 U.S.C.C.A.N. 7659, 7797, 7823 (1978) (emphasis added).

The Commission's regulations carry out the statutory regime reposing in the Commission exclusive authority to make QF status determinations: Subpart B of the regulations, which implement section 201 of PURPA, provide specific standards that cogenerators must meet to be QFs. 18 C.F.R. § 292.205. These regulations also provide two specific procedures by which a QF's status is acknowledged: self-certification and optional certification. 18 C.F.R. § 292.207. Finally, these regulations provide that the Commission may revoke a QF's status, 18 C.F.R. § 292.207(d), or waive compliance with QF standards for a facility that it determines produces significant energy savings. 18 C.F.R. § 292.205(c). Nowhere do these regulations contemplate a role for the state in setting QF standards or determining QF status.

As a policy matter, a uniform federal decisionmaker is necessary for those cases in which the Commission waives the operating and efficiency standards for QF determinations and certifies the facility because it is in the public interest. *See* 18 C.F.R. § 292.205(c). QFs certified in this manner by definition do not meet federal efficiency standards. In a system with dual federal and state enforcement of efficiency standards, however, a state could decide that a QF certified under this waiver provision is not in compliance with efficiency standards and impose sanctions.[11]

The CPUC program usurps the Commission's authority by authorizing the Utilities to determine whether a QF is in compliance with federal efficiency standards. It also violates PURPA by substituting for any "non-complying" QF an "alternative" avoided cost rate equal to 80% of the Utilities' avoided cost for short term economy energy. QFs are entitled to receive the *full* avoided cost rates provided in the QF's standard offer contract, 18 C.F.R. § 292.304, and not a rate that is 80% (or less than 80%) of the full

**11.** As a practical matter, the need for uniform federal authority over the determination of QF status is also apparent. The determination of QF status is not a purely ministerial act based on the application of standard formulas. Instead, such a determination requires interpretation based on changing policy and technical concerns. The regulations provide detailed formulas under which status determinations are made, and the proper interpretation of these formulas can change based on the Commission's changing policy and technical concerns. For example, to satisfy the regulations' operating and efficiency standards, the cogenerator's "useful thermal output" must be no less than 5% of its total energy output. 18 C.F.R. § 292.205. But what constitutes "useful thermal output" requires analysis of factors such as the nature of the use and the economic justification of the use, factors which clearly may vary based on the policy concerns in question. *See Electrodyne Research Corp.,* 32 Federal Energy Reg. Comm'n Rep. (CCH) ¶ 61,-102, at 61,279 (1985) (noting that to be "useful", a thermal output must have an independent business justification, a determination which becomes problematic when the proposed application represents a new technology). Similarly, the Commission's decision to waive operating and efficiency standards also depends on subjective policy criteria. *See Nelson Indus. Steam Co.,* 39 Federal Energy Reg. Comm'n Rep. (CCH) ¶ 61,201, at 61,274 (1987) (waiving efficiency standards based in part on the benefit to the community of the anticipated increase in employment if the project is permitted to proceed).

avoided cost rate.[12] The CPUC program thus authorizes the Utilities to deny to QFs one of the benefits to which they are statutorily entitled under PURPA, resulting in the effective decertification of that QF. Because the authority to make QF status determinations resides exclusively with the Commission, we conclude that the CPUC program is preempted by federal law.

## III

The district court relied on several rationales to conclude that although the Commission has ultimate authority to make QF status determinations, the Commission's authority in this respect is not *exclusive*. The court first noted that because cogenerators may self-certify with the Commission, cogenerators play a role in assessing compliance with federal efficiency standards. The court also noted that the Commission has stated that a utility need not enter into an agreement with a cogenerating facility that it does not consider to be in compliance with efficiency standards, *see Small Power Production: Order Granting in Part and Denying in Part Rehearing of Orders Nos. 69 & 70, and Amending Regulations,* 45 Fed.Reg. 30,958, 33,963 (May 21, 1980), and suggested that this indicates that utilities also share a role in assessing compliance with efficiency standards. Because cogenerators and utilities both may play a role in assessing federal efficiency standards, the court reasoned that the state may also play a role.

Although the district court's factual assertions are correct, the inferences the court draws are not warranted. To the contrary, the Commission adopted self-certification procedures because it presumed that in most cases there would be no controversy as to whether a cogeneration facility actually meets efficiency standards. *Id.* For those cases in which the cogenerator's status was called into question, the Commission indicat-

ed that the optional certification process should be used. *Id.* ("The Commission expects that, for the great majority of facilities requesting that utilities purchase their electric output, there will be no disagreement as to their eligibility. In questionable cases, the rules as issued provide for Commission determination of the facility's status. Thus, the Commission perceives no need to require additional paperwork in uncontested determinations.").

Thus, the provisions relied on by the district court reflect only the fact that, in the bulk of cases, self-certification is appropriate. When self-certification is challenged by a utility, optional certification if granted by the Commission will override the utility's refusal to enter into a contract with the cogenerating facility. 18 C.F.R. § 292.207(b). The regulations contain no provision that would permit a utility to decline to purchase energy from a QF that has been certified under the optional procedure. The utility may petition the Commission for decertification of the QF, 18 C.F.R. § 292.207(d)(1), or may petition the Commission for a declaratory order that the facility is no longer a QF, 18 C.F.R. § 385.-207(a)(2). It is the Commission's role, not the state's or utilities' role, to determine that QFs that have received certification from the Commission no longer meet federal operating and efficiency standards. A utility may not change the contractual obligations between the QF and the utility based on such a determination. The Commission has explicitly provided comprehensive procedural mechanisms under which QFs may be officially certified and decertified by the Commission; to permit states or utilities to challenge the compliance of QFs outside of the procedures established by the Commission could result in determinations that are inconsistent with this federal scheme and would, in effect, afford certification by the Commission little or no deference.

**12.** For QFs with long-term contracts for the sale of firm energy and capacity, the "alternative" avoided cost rate is less than 80% of the rate specified in the standard offer contract. As noted above, as-available energy is less expensive than firm energy because energy delivered at the discretion of the QF is of less value to the utility than is energy delivered pursuant to a contractu-

al obligation. The "alternative" avoided cost rate authorized by the CPUC program appears to be based on the short-term as available rate for energy and capacity. Thus, an alternative rate that deletes 20% from the as-available rate could, in fact, result in a much greater decrease than 20% from the long-term firm energy rate.

■ The district court also found support in the state's broad ratemaking authority under PURPA for a concurrent state and federal role in monitoring and enforcing QF compliance with federal efficiency standards. We agree that PURPA delegates to the states broad authority to implement *section 210* of the statute. Section 210(f) of PURPA instructs the states to implement any rule prescribed by the Commission under section 210(a). 16 U.S.C. § 824a–3(f). Section 210(a), in turn, directs the Commission to prescribe rules that require utilities to purchase electric energy from and sell electric energy to cogenerators. 16 U.S.C. § 824a–3(a). Thus, the states play the primary role in calculating avoided costs and in overseeing the contractual relationship between QFs and utilities operating under the regulations promulgated by the Commission. *See Administrative Determination*, IV Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457 at 32,173 (stating that the Commission "afford[ed] the states ... a great deal of flexibility both in the manner in which avoided costs are estimated and in the nature of the contractual relationship between utility and QF").

The state's authority to implement section 210 is admittedly broad, but nothing in the language of this section indicates that such authority includes the authority to make QF status determinations. Section 210(f) specifically requires the states to implement rules that the Commission has prescribed *pursuant to subsection (a) of this section*, 16 U.S.C. § 824a–3(f), and subsection (a) provides for rules that require utilities to buy and sell electric energy from cogenerating facilities; it does not deal with the standards under which a cogenerating facility will be considered a qualifying facility.[13]

The Commission's Subpart C regulations, which were adopted pursuant to section 210, are similarly limited to issues such as determining a utility's avoided costs and the rates

for sales of electricity, 18 C.F.R. § 292.304–.305, and establishing standards to ensure the safety and reliability of interconnected operations, 18 C.F.R. § 292.308.

■ The district court also relied on 18 C.F.R. § 292.304(e)(2)(iii), which describes what factors the state regulatory agency should consider when calculating avoided costs:

(e) *Factors affecting rates for purchases.* In determining avoided costs, the following factors shall, to the extent practicable, be taken into account: ...

(2) The availability of capacity or energy from a qualifying facility during the system daily and seasonal peak periods, including:

(i) The ability of the utility to dispatch the qualifying facility;

(ii) The expected or demonstrated reliability of the qualifying facility;

(iii) *The terms of any contract or other legally enforceable obligation, including the duration of the obligation, termination notice requirement and sanctions for non-compliance....*

(emphasis added). The district court concluded that subsection (iii)'s reference to "sanctions for non-compliance" suggests that the state has authority to sanction noncompliance with federal operating and efficiency standards when setting avoided cost rates. We disagree.

Rather than suggest that states may impose sanctions on a QF for failure to comply with operating and efficiency standards, section 292.304(e)(2)(iii) simply recognizes that the value of electric energy provided by the QF varies depending on the terms of its commitment to the utility, the length of time during which the QF has guaranteed that it will supply electric energy to the utility, the certainty and dependability of the supply,

---

**13.** The CPUC and the Utilities also refer to section 210(g) of PURPA, which provides (1) for judicial review of any state action taken pursuant to section 210(a), and (2) that an individual or the Commission may bring an action to enforce any requirement established by the state pursuant to section 210(f). 16 U.S.C. § 824a–3(g). These sections do not support appellees' position

because the fact that the state's implementation of section 210 of PURPA may be challenged through the state adjudicatory machinery, and the fact that state requirements promulgated under section 210 of PURPA may also be so enforced, says nothing about the state's authority to oversee QF status determinations, which is covered by *section 201* of PURPA.

and the existence in the contract of penalty provisions for the breach of any contractual obligations. *Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of PURPA,* 45 Fed.Reg. 12214, 12226 (1980) ("the value of the service from the qualifying facility ... may be affected by the degree to which the qualifying facility ensures by contract or other locally enforceable obligation that it will continue to provide power."). While the state may consider contract terms, including provisions in the contract for sanctions for non-compliance, when calculating avoided costs, section 292.-304(e)(2)(iii) does not authorize the state to decertify or penalize on account of a QF's failure to comply with efficiency standards.

Finally, in reaching its conclusion, the district court relied in part on the fact that the standard offer contracts in question contain provisions under which the QF warrants its continued compliance with federal operating and efficiency standards. As the district court recognized elsewhere in its opinion, however, the fact that QFs may warrant their continued compliance with federal standards in the contracts they sign with utilities does not necessarily mean that the utilities or the state may unilaterally determine whether violations of that warranty have occurred. The simple practice of cross-referencing federal regulations in state sanctioned contracts does not, by itself, provide a foundation for assuming regulatory authority that is exclusively federal.[14]

## IV

Although appellees generally concur that the Commission has ultimate authority to certify and decertify QFs, they contend that the CPUC program is not preempted by PURPA because it does not in fact authorize the Utilities to make QF status determinations, but instead only adjusts the avoided cost rate to reflect the reduced efficiency of a QF that is not in compliance with operating and efficiency standards. Specifically, they suggest that the program does not result in the decertification of QFs because a "non-complying" QF still receives the benefits to which it is entitled under PURPA, including the opportunity to sell electric energy to utilities at *an* avoided cost rate. According to appellees, the CPUC program merely authorizes payment of an "alternative" avoided cost rate in accordance with PURPA's goals of promoting efficient cogeneration and preventing ratepayer subsidization of inefficient QFs.

We are not persuaded by appellees' attempts to characterize their program as one that merely imposes an "alternative" avoided cost rate. As a preliminary matter, the Commission's regulations are clear that the rate to be paid by utilities for electric energy be determined according to the avoided cost to the *utility* of generating that energy or purchasing it elsewhere, and not according to the QF's efficiency. The regulations thus require that avoided costs be based on enumerated data regarding the utility's operational and cost characteristics, *see* 18 C.F.R. § 292.304(e)(1), and on the availability, usefulness, type, and reliability of the energy or capacity that is purchased, *see id.* § 202.-304(e)(2)–(4). *See also Administrative Determination,* IV Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457, at 32,164 (explaining that the factors provided at 18 C.F.R. § 292.304(e) are relevant to the determination of avoided costs because they "directly affect the ability of a QF to defer utility costs"). The cogenerator's efficiency is relevant in determining whether it qualifies under PURPA as a QF; however, the QF's efficiency is entirely unrelated to the *utility's* avoided costs.

**14.** As a final matter, we note that the CPUC and the Utilities cite to *FERC v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), for the proposition that in enacting PURPA, Congress expressed its preference to let the States retain the primary regulatory role. *Id.* at 765 & n. 29, 102 S.Ct. at 2140–41 & n. 29 (internal quotations omitted). This passage does not support appellees' position, however, because it is taken from a section of the opinion discussing

Titles I & III of PURPA, and not Title II. Titles I & III seek to encourage states to adopt certain regulatory practices for electric and gas utilities by directing state agencies to "consider" adopting and implementing specified standards. *Id.* at 746, 102 S.Ct. at 2130. By contrast, Title II of PURPA, the statutory section in question in this case, establishes a distinctly different federal-state relationship from those established in Titles I & III.

Moreover, as we have previously noted, the Commission's regulations provide that QFs are entitled to sell electric energy to utilities at a rate that is the utility's *full* avoided costs. 18 C.F.R. § 292.304(d). In implementing these regulations, the Commission considered and rejected a proposal that it adopt rates that were less than a utility's full avoided costs. *Administrative Determination*, IV Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457, at 32,158 ("in order to maximize the incentives for QFs, the Commission sets the price for purchases ... at the statutory ceiling"); *see also American Paper Inst.*, 461 U.S. at 412–18, 103 S.Ct. at 1927–31 (upholding the Commission's adoption of full avoided costs rates, the statutory maximum under section 210). In contrast to these requirements, the "alternative" avoided cost rates authorized by the CPUC program are calculated at 80% of the short-term "economy" published avoided cost rate, a rate that clearly is less than the full avoided cost rate to which the QFs are entitled.

Appellees both contend that PURPA requires that the rate for the purchase of electric energy "shall be just and reasonable and in the public interest." 16 U.S.C. § 824a-3(b); *see also* 18 C.F.R. § 292.304(a). They also note that Congress did not want consumers to be forced to subsidize cogeneration, and contend that their "alternative" avoided cost rate merely eliminates a consumer subsidy.

We do not agree that the CPUC has the authority to alter the terms of the standard offer contracts on this basis. In implementing its regulations, the Commission clearly weighed Congress's desire to promote cogeneration while not burdening ratepayers, and concluded that requiring utilities to pay *full* avoided costs properly balanced these interests. 18 C.F.R. § 292.304(d); *Administrative Determination*, IV Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457, at 32,158 (recognizing that ratepayers should be indifferent to the source of power and that if rates are set at the utility's avoided costs, ratepayers will pay neither more nor less than they otherwise would have). If purchase rates are set at the utility's avoided cost, consumers are not forced to subsidize QFs because they are paying the same amount they would have paid if the utility had generated energy itself or purchased energy elsewhere.

The underlying motivation behind the CPUC program is to lower the rates set in appellees' standard offer contracts because they are higher than the Utilities' current avoided costs. As noted above, this differential exists because the standard offer contracts lock the Utilities into paying rates that were calculated on incorrect assumptions about the future cost of fossil fuels, the primary fuel source used by the utility to generate electric energy. However, the fact that the prices for fuel, and therefore the Utilities' avoided costs, are lower than estimated, does not give the state and the Utilities the right unilaterally to modify the terms of the standard offer contract. Federal regulations provide that QFs are entitled to deliver energy to utilities at an avoided cost rate calculated at the time the contract is signed. 18 C.F.R. § 292.304(d)(2). The Commission recognized that, at times, the avoided cost rate provided in the contract might be greater or less than the utility's current avoided costs but that certainty as to rate was important:

> The Commission recognizes this possibility [that current avoided costs might be lower than the rates provided in the contracts] but is cognizant that in other cases, the required rate will turn out to be lower than the avoided cost at the time of purchase.... Many commentators have stressed the need for certainty with regard to return on investment in new technologies. The Commission agrees with these ... arguments, and believes that, in the long run, "overestimations" and "underestimations" of avoided costs will balance out.

*See Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of PURPA*, 45 Fed.Reg. 12214, 12224 (1980). While the actual avoided cost might vary over time, under current law the QF remains entitled to receive the avoided cost rate specified in its contract.

Thus, although the avoided cost rates calculated in the Utilities' contracts are in fact

higher than the Utilities' current short term avoided cost rates, the proper remedy for such a situation is to ensure that future standard offer contracts contain more flexible pricing mechanisms. *See Administrative Determination,* IV Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457, at 32,172–74. By contrast, if a state or a utility determines that a QF is no longer in compliance with federal efficiency standards, then the proper remedy is either to petition the Commission to decertify the QF or to seek a declaratory order that the facility is no longer a QF. 18 C.F.R. §§ 292.207(d)(1) & 385.207(a)(2). What the state may not do, however, is to intrude into the Commission's exclusive jurisdiction to make QF status determinations by denying to certified QFs the full avoided cost rates to which they are entitled.

## V

 We conclude that the CPUC program is preempted by PURPA insofar as it authorizes the Utilities to determine that a QF is not in compliance with the Commission's operating and efficiency standards and to impose a reduced avoided cost rate on that QF. Moreover, to the extent that the CPUC program authorizes the Utilities to disconnect from parallel operation a "non-complying" QF, and thus to prevent such a QF from selling energy to and purchasing energy from the Utility, it is also preempted under federal law. *See* 18 C.F.R. § 292.303(c) (requiring electric utilities to interconnect with QFs as necessary to accomplish sales and purchases with the QFs).

However, *insofar as the CPUC's program requires QFs to submit operating data to the Utilities for monitoring, and insofar as the monitoring requirements do not impose an undue burden on the QFs, the program is not preempted.* Because reasonable monitoring by the state and by utilities does not by itself effect a determination of status, it falls within the state's broad ratemaking authority. In fact, in promulgating the federal regulations, the Commission acknowledged that information routinely flowing between

QFs and utilities would allow the utilities to determine if the QF met federal operating and efficiency standards. *Small Power Production and Cogeneration Facilities—Qualifying Status,* 45 Fed.Reg. 17959, 17962 (1980). If based on this data, a utility believes that the QF is not in compliance with federal standards, it may petition the Commission to revoke the cogenerator's QF status.

For the reasons stated above, the order of the district court granting summary judgment for appellees is reversed. This case is remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**