Joseph A. RADICI, Theresa A. Radici, Michelle E. Radici, Plaintiffs–Appellants,

v.

ASSOCIATED INSURANCE COMPANIES, Blue Cross Blue Shield of Indiana, Defendants–Appellees.

No. 98–17437.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 2000

Filed June 29, 2000

Jeffrey Isaac Ehrlich, Arlington, Virginia, Steven J. Parsons, Parsons & Pursiano, Las Vegas, Nevada, for the plaintiffs-appellants.

Leann Sanders, Monica L. Pierce, Alverson, Taylor, Mortensen, Nelson & Sanders, Las Vegas, Nevada, for the defendants-appellees.

Before: TASHIMA and GRABER, Circuit Judges, and KELLEHER,[1] Senior District Judge.

KELLEHER, District Judge:

Plaintiffs Joseph, Theresa and Michelle Radici (together, "the Radicis") brought an action against their group health insurers, Associated Insurance Companies, Inc., and Blue Cross and Blue Shield of Indiana (together, "AICI"). The Radicis' amended

1. The Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation.

complaint alleged that AICI unlawfully terminated Michelle's health insurance coverage, resulting in her death. The district court dismissed all of the Radicis' state-law claims for relief, holding that state-law remedies are preempted by the continuation health care coverage provisions of the federal Public Health Services Act ("PHSA"). *See* 42 U.S.C. §§ 300bb–1 to bb–8. The Radicis appeal. We reverse the district court's decision, holding that the continuation health care coverage provisions of the PHSA lack preemptive force.

## FACTUAL BACKGROUND

Michelle Radici was born in 1982 with debilitating medical conditions that left her totally disabled: a brain stem anomaly, hydrocephalus, spina bifida and the congenital absence of one kidney. Since 1990, Michelle's substantial medical bills were paid by her father's health insurer, AICI.

Between 1989 and 1995, Joseph Radici worked for two school districts in Indiana, both of which provided health coverage through AICI (the "Indiana policy"). In 1992, AICI and the Radicis reached an agreement that permitted Michelle to remain at home with the care of round-the-clock skilled nursing, thereby avoiding expensive and time-consuming hospital stays.

In August 1995, the Radici family moved to Las Vegas, Nevada, where Joseph had obtained a new position with a local school district. By virtue of his new position, Joseph and his family became enrolled in the health care plan offered by the Las Vegas school district (the "Nevada policy"). The Nevada policy excluded coverage of pre-existing medical conditions (such as Michelle's) for the first year of enrollment. To preserve Michelle's skilled nursing care, Joseph exercised his PHSA and contractual rights to continue health coverage under the Indiana policy, which did provide coverage for Michelle's ailments. Joseph elected continuation coverage on Michelle's behalf on September 1, 1995.

During the first year in Nevada, Michelle received her normal course of treatment under the Indiana policy. But in late August 1996, with two days' notice, AICI informed the Radicis that Michelle's continuation coverage under the Indiana policy would be terminated on September 1, 1996. AICI apparently canceled Michelle's coverage because the Nevada policy's one-year exclusion of coverage for pre-existing conditions had lapsed. AICI contended that the lapse of that exclusion automatically terminated AICI's obligation to provide continuation coverage under the Indiana policy, because Michelle could now be covered under the Nevada policy.

After AICI canceled Michelle's continuation coverage, the Radicis struggled for several months to provide the necessary care under the Nevada policy. Although Michelle became covered under the Nevada policy, the Nevada insurer would not agree to provide round-the-clock skilled nursing care. Despite her family's efforts, Michelle Radici died on December 11, 1996.

## PROCEDURAL HISTORY

The Radicis filed suit against AICI in the District of Nevada on September 11, 1996—less than two weeks after AICI denied further continuation coverage to Michelle. The Radicis pursued state law claims for injunctive relief, breach of contract, breach of the duty of good faith and fair dealing, and unfair insurance practices, *see* Nev.Rev.Stat. § 686A.310. The Radicis also sought relief under the PHSA's continuation-coverage enforcement provision. *See* 42 U.S.C. § 300bb–7. After Michelle died, the Radicis amended their complaint to remove the state-law claim for injunctive relief.

On April 6, 1998, the district court dismissed the Radicis' three remaining state-law claims on preemption grounds. The Court explained that the PHSA preempted state law claims by analogy to the type of preemption employed in ERISA cases.

On November 23, 1998, the district court dismissed the Radici's PHSA claim, because it sought purely equitable and declaratory relief. The court concluded that the claim for equitable relief was moot because Michelle had died and restitution was unavailable. In addition, the court held that the claim for declaratory relief was likewise mooted by Michelle's death. The court then dismissed the case for lack of subject matter jurisdiction.

The district court entered judgment against the Radicis on November 24, 1998. The Radicis timely filed a notice of appeal. On appeal, the Radicis challenge only the district court's order dismissing the state-law claims on preemption grounds. They do not challenge the district court's decision to dismiss the PHSA claim.

## JURISDICTION

■ Although the Radicis apparently based their claim of subject matter jurisdiction on diversity of citizenship, the district court had proper subject matter jurisdiction because the presence of the PHSA claim conferred federal question jurisdiction. *See Andrus v. Charlestone Stone Prod. Co., Inc.*, 436 U.S. 604, 608 n. 6, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978) ("Nor does it matter that the complaint does not in so many words assert § 1331(a) as a basis of jurisdiction, since the facts alleged in it are sufficient to establish such jurisdiction and the complaint appeared jurisdictionally correct when filed."). We have jurisdiction to hear the appeal, because the appeal arises from a final judgment of the district court. *See* 28 U.S.C. § 1291.

## STANDARD OF REVIEW

■ We review de novo a district court's decision preempting state law claims. *See Associated Builders & Contractors, Inc. v. Local 302 Int'l Bhd. of Elec. Workers*, 109 F.3d 1353, 1354–55 (9th Cir.1997).

**2.** Continuation coverage is frequently de-

## THE PUBLIC HEALTH SERVICES ACT

On April 7, 1986, Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub.L. 99–272. Some of COBRA's many provisions concern "continuation health care coverage." Continuation coverage enables employees (and their dependents) who leave their jobs to retain, for 18–36 months after their departure, the same health coverage they enjoyed while working.[2] COBRA's provisions mandating that group health plans provide continuation coverage benefits were placed in both the PHSA and the Employee Retirement Income Security Act ("ERISA"). *See* 42 U.S.C. §§ 300bb–1 to bb–8 (PHSA); 29 U.S.C. §§ 1161–69 (ERISA).

> COBRA amended both ERISA and the PHSA by adding essentially identical continuation coverage and notification provisions. ERISA, however, exempts any "government plan" from its employee benefit plan provisions. 29 U.S.C. § 1003(b)(1).... COBRA's amendments to the PHSA therefore partly fill this gap by providing similar protection to beneficiaries losing coverage under a plan maintained by "any State that receives funds under this chapter, by any political subdivision of such a State, or by any agency or instrumentality of such a State or political subdivision." 42 U.S.C. § 300bb–1.

*Williams v. New Castle County*, 970 F.2d 1260, 1264 (3d Cir.1992) (citations omitted).

The COBRA amendments to the PHSA specifically provide that

> each group health plan that is maintained by any State ... or by any agency or instrumentality of such a State or political subdivision, shall provide ... that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the elec-

scribed as "COBRA benefits."

tion period, continuation coverage under the plan.

42 U.S.C. § 300bb–1.

COBRA beneficiaries must be treated in the same manner as similarly situated beneficiaries for whom a qualifying event has not taken place. *See id.* at § 300bb–2(1). COBRA benefits may last between 18 and 36 months depending on a variety of factors, including disability status and Medicare eligibility. *See id.* at § 300bb–2(2). An employee must be notified of pending eligibility for COBRA benefits in timely fashion. *See id.* at § 300bb–6. And an employee must affirmatively elect to receive COBRA benefits—such benefits will not be conferred automatically. *See id.* at § 300bb–5. Finally, "[a]ny individual who is aggrieved by the failure of a State, political subdivision, or agency or instrumentality thereof, to comply with the requirements of this subchapter may bring an action for appropriate equitable relief." *See id.* at § 300bb–7 (the "enforcement provision").

## DISCUSSION

The district court held that the COBRA amendments to the PHSA provide beneficiaries an exclusive remedy against their group health care providers, thereby preempting additional state law remedies. On appeal, the Radicis contend that the COBRA amendments lack preemptive force when analyzed according to traditional preemption doctrines. In addition, the Radicis contest the district court's conclusion that the PHSA preempts state-law claims by analogy to ERISA's preemptive power. Whether the COBRA amendments to the PHSA have preemptive force presents a question of first impression.

### A. Preemption Doctrine

■ The Supremacy Clause of the federal Constitution provides Congress with the power to preempt state law. *See* U.S. Const. art. VI. Hence, preemption analysis is almost entirely a question of Congressional intent. *See California Fed.*

*Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (plurality opinion). We begin our analysis with the assumption that Congress did not intend to displace state law. *See Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).

■ Courts have described and categorized preemption doctrines with great variety. As a general matter, though, there appear to be four distinct types of preemption:

(1) Congress may preempt state law by so stating in express terms;

(2) Congress's intent to preempt all state law in a *particular area* may be inferred where the scheme of federal regulation is comprehensive;

(3) Congress's intent to preempt a *whole field* may be inferred if the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject; and

(4) Compliance with both federal and state regulations is physically impossible.

*See, e.g., Louisiana Public Serv. Comm'n v. FCC,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); *Independent Energy Producers Ass'n, Inc. v. California Pub. Util. Comm'n,* 36 F.3d 848, 853 (9th Cir.1994); *Baker & Drake, Inc. v. Public Serv. Comm'n (In re Baker & Drake, Inc.),* 35 F.3d 1348, 1352–53 (9th Cir.1994).

■ Preemption doctrine does not merely proscribe states from enacting laws that are inconsistent with federal law. Preemption principles also forbid plaintiffs from pursuing claims, or remedies, that interfere with Congress' intent to provide an exclusive federal remedy. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) ("The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the

conclusion that ERISA's civil enforcement remedies were intended to be exclusive.").

■ In general, however, "federal regulation of a subject—even thoroughgoing federal regulation—does not prevent states from adding remedies to the arsenal established by federal law." *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 296 (7th Cir.1992) (cited approvingly by the Ninth Circuit in *Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., Inc.*, 50 F.3d 1486, 1492 (9th Cir. 1995)); *see also Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 255–56, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (*refusing* to preempt state punitive damages remedy despite expansive federal nuclear power regulations).

Because preemption analysis focuses on Congressional action and intent, we analyze, in turn, the wording of the COBRA amendments to the PHSA, the legislative history surrounding COBRA's passage, and cases discussing COBRA preemption.

## 1. Textual Analysis of the COBRA Amendments to the PHSA

■ Congress did not explicitly preempt state law remedies pertaining to COBRA coverage and benefits. Indeed, none of the eight provisions of § 300bb mentions preemption, nor hints that the federal remedy provided is exclusive.

The COBRA amendments to the PHSA include a separate enforcement provision, which authorizes an award of "appropriate equitable relief."

> Any individual who is aggrieved by the failure of a State, political subdivision, or agency or instrumentality thereof, to comply with the requirements of this subchapter may bring an action for appropriate equitable relief.

42 U.S.C. § 300bb–7.

This provision nowhere mentions preemption of additional state remedies, nor does the provision include words of exclusivity. Indeed, the provision utilizes the permissive term, "may," as opposed to the stronger "shall," which, had it been employed, might have implied the exclusivity of the § 300bb–7 remedy. The lack of explicit preemption clues suggests that § 300bb was not intended to preempt state law remedies entirely.

## 2. Legislative History of COBRA

The House and Senate produced five separate reports in preparing COBRA for passage in late 1985 and early 1986. COBRA's continuation health care coverage provisions are discussed at various points throughout these reports. *See* S.Rep. No. 99–146, at 363–67, 453–54, *reprinted in* 1986 U.S.C.C.A.N. 42, 322–26, 412–413; H.R.Rep. No. 99–241 (Part 1), at 44–45, *reprinted in* 1986 U.S.C.C.A.N. 579, 622–23; H.R.Rep. No. 99–300, at 308–309, 319–20, *reprinted in* 1986 U.S.C.C.A.N. 756, 959–60, 970–71. These sections make no mention of remedies for failure to comply with COBRA regulations. And the reports are completely silent on the topic of preemption of state laws or remedies.

In two sections wholly unrelated to continuation coverage, the reports mention preemption. *See* H.R.Rep. No. 99–300, at 544, *reprinted in* 1986 U.S.C.C.A.N. 756, 1055 (COBRA amendments to the Fishery Conservation and Management Act of 1976 "may preempt state management of fisheries"); H.R.Rep. No. 99–241 (Part 1), at 4, *reprinted in* 1986 U.S.C.C.A.N. 579, 582 (although COBRA amendments to Medicare legislation provide for certain penalties against hospitals that fail to comply with regulations, the House report states explicitly that "[t]hese provisions would not preempt stricter state laws."). Despite their discussion of preemption, these passages shed no light on Congress's intent vis-a-vis continuation health care coverage.

In late 1986, Congress enacted various amendments and technical modifications to the COBRA health care provisions. As before, the legislative history contains no mention of possible remedies for depriva-

tion of coverage. *See* H.R. Conf. Rep. No. 99–841, at II 859–60, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4947–48.

Congress next dealt with continuation coverage in 1989, amending the provisions that govern the duration of COBRA benefits. Unlike the reports accompanying the original bill, however, the reports pertaining to the 1989 amendments *do* contain passages reflecting Congress's intent with respect to preemption.

The 1989 amendments extended COBRA benefits provisions to permit beneficiaries entitled to certain Medicare benefits to extend their COBRA coverage from 18 to 36 months. *See* H.R. Conf. Rep. No. 101–386, at 667–68, *reprinted in* 1989 U.S.C.C.A.N. 3018, 3270–71. In addition, beneficiaries deemed disabled under Social Security Administration guidelines could receive COBRA coverage for up to 29 months. *See id.* at 899–901, *reprinted in* 1989 U.S.C.C.A.N. at 3502–3504. The 1989 amendments also redefined the circumstances in which a provider of COBRA benefits could terminate coverage. *See* H.R.Rep. No. 101–247, at 51, *reprinted in* 1989 U.S.C.C.A.N. 1906, 1943 ("The bill deletes the provision allowing continuation coverage to be terminated upon the coverage of the qualified beneficiary under the group health plan of an employer other than the employer providing the continuation coverage.").

The reports reveal that Congress, in particular the House, debated the effect of COBRA remedies, as well as preemption of state laws. The following passage from a House report reflects Congress's dissatisfaction with a Supreme Court opinion that preempted state remedies for an ERISA claimant:

> In recent years, the Committee has received numerous complaints and inquiries from Members of Congress and their constituents about improper denials of medical claims, improper denials of continuation coverage, or unreasonable delays in processing claims by employers or insurers. Participants in ERISA-covered employee benefit plans that have been treated in this manner are concerned that the Supreme Court's interpretation of ERISA (particularly as articulated in *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)) as preempting state laws that authorize punitive or other extracontractual damages in connection with claims for benefits effectively denies them of [sic] legal recourse. The Committee shares their concern.

In *Pilot Life,* the Supreme Court held that state common law claims against an insurance company for breach of contract and bad faith arising out of an improper denial of disability benefit claims under an ERISA-covered plan were preempted. In addition, the Supreme Court declined to fashion a Federal common law remedy for improper processing of benefit claims, holding that ERISA's civil enforcement provisions under section 502 were intended to be the exclusive remedies afforded to plan participants and beneficiaries. The Committee disagrees with this latter conclusion.

The Committee believes that the legislative history of ERISA and subsequent expansions of ERISA support the view that Congress intended for the courts to develop a Federal common law with respect to employee benefit plans, including the development of appropriate remedies, even if they are not specifically enumerated in section 502 of ERISA. Since the issue of preemption and civil remedies under ERISA is within the exclusive purview of the labor committees of Congress, the Committee has, over the years, considered the option of amending the statute to encompass specifically several additional remedies. In light of the legislative history on this issue, however, the Committee believes such action is unnecessary.

The Committee reaffirms the authority of the Federal courts to shape legal and equitable remedies to fit the facts

and circumstances of the cases before them, even though those remedies may not be specifically mentioned in ERISA itself. In cases in which, for instance, facts and circumstances show that the processing of legitimate benefit claims has been unreasonably delayed or totally disregarded by an insurer, an employer, a plan administrator, or a plan, the Committee intends the Federal courts to develop a Federal common law of remedies, drawing upon principles enunciated in state law, including such remedies as the awarding of punitive and/or compensatory damages against the person responsible for the failure to pay claims in a timely manner.

H.R.Rep. No. 101–247, at 55–56, *reprinted in* 1989 U.S.C.C.A.N. 1906, 1947–48.

This excerpt makes clear that Congress did not intend COBRA beneficiaries (under ERISA) to be denied appropriate state law remedies for "improper denials of continuation coverage." Congress was apparently content to permit preemption in name—so long as the federal courts cloaked state law remedies in the garb of "Federal common law remedies."

Although the foregoing discussion of continuation coverage mentions only the ERISA provisions, *see* 29 U.S.C. § 1132, nearly identical COBRA benefits provisions were also placed in the PHSA. Therefore, the conclusions in this report apply with equal force to claims brought under the PHSA's COBRA enforcement provision.

The same House report makes one additional allusion to Congress's intent not to preempt state laws. In a subsequent passage, the report describes a "special rule" that renders liable persons other than an employer, if such persons fail to comply with the employer's request for action.

When an employer changes from one insurance company to another, State law often imposes similar requirements on the new insurance company to continue to provide coverage to the employer's existing insureds. *As is the case gener-*

*ally with respect to the health care continuation rules, these State laws are not affected by the special rule described above.* The special rule and the State laws are to apply concurrently so that in any specific instance, the more extensive requirements will apply. Thus, for example, if under State law the qualified beneficiaries are entitled in one respect to greater rights than under the health care continuation rules such that compliance with State law automatically means compliance with the health care continuation rules, the State law rule becomes the operative rule with respect to that aspect.

Of course, to the extent the state laws described above are preempted under present law, the Committee intends that nothing in this section should be read to change in any way the broad Federal preemption with respect to employee benefit plans under section 514 of ERISA.

H.R.Rep. No. 101–247, at 59, *reprinted in* 1989 U.S.C.C.A.N. 1906, 1951 (emphasis added).

In the passage emphasized above, the House report states that the "general" approach of the continuation coverage provisions would not preempt state lawmaking efforts. The final paragraph, which saves preemption in certain instances, bows only to ERISA's strong express preemption provision. That paragraph should not be analogized to the PHSA, which lacks a "broad Federal preemption" provision.

This House report supports one additional conclusion: *insurers* providing COBRA continuation coverage may be liable for improper denial of benefits. *See* H.R.Rep. No. 101–247, at 57, *reprinted in* 1989 U.S.C.C.A.N. 1906, 1949 ("One purpose of the special audit rule is to ensure that employers (and other persons liable for the civil penalty, such as an insurance company or health maintenance organization (see discussion below)) have an incentive to monitor themselves for compliance

with the health care continuation rules."); *id.* at 59, *reprinted in* 1989 U.S.C.C.A.N. 1906, 1951 ("Examples of a person who could be liable under this provision include a health maintenance organization, an insurance company, or a plan administrator.").

The legislative history suggests that Congress did not intend to displace state-law remedies by enacting § 300bb–7. Although Congress expressed mild reservations about the propriety of permitting state-law remedies in view of ERISA's preemptive force, those reservations are muted in the PHSA context, for the PHSA lacks an express preemption provision.

### 3. Cases Discussing Preemption

Only two district courts have discussed the possibility of PHSA preemption. Those courts reached different conclusions. In *Van Hoove v. Mid–America Bldg. Maintenance, Inc.,* 811 F.Supp. 609 (D.Kan.1993), the court cited an unpublished opinion from the same district that held that COBRA provisions in the PHSA did *not* preempt state-law claims. *See id.* at 611. Due to the complete lack of analysis, however, *Van Hoove* is not particularly persuasive.

In *Moran v. Peralta Community College Dist.,* 825 F.Supp. 891 (N.D.Cal.1993), the district court held that the PHSA's COBRA provisions preempted state law by analogy to ERISA preemption. *See id.* at 894–95. Although *Moran* is clearly on point, the opinion is unpersuasive for several reasons. First, Moran's counsel "conceded" that the PHSA had the same preemptive force as ERISA. As a result, the district court did not need to, nor did it, attempt a meaningful comparison between the PHSA and ERISA. Second, the *Moran* court ignored a bevy of important distinctions between the PHSA and ERISA. For one, ERISA contains a broadly-worded express preemption provision that governs the COBRA provisions contained therein. The PHSA contains no preemption provision. This crucial difference between ERISA and the PHSA is germane to our preemption analysis. For these reasons, we discount *Moran*'s holding.

Our review of the limited case law on point demonstrates that courts have not determined that the COBRA provisions in the PHSA preempt state remedies.

### B. Conclusion

The claim of preemption under ERISA is much stronger than under the PHSA. The PHSA nowhere mentions preemption. Although ERISA and the PHSA contain nearly identical COBRA provisions, the preemptive effect of ERISA does not create PHSA preemption. Furthermore, Congress was silent on the issue of PHSA/COBRA preemption. Because the topic of continuation health care coverage is neither excessively regulated, nor quintessentially "federal" in character, Congress bears the burden of demonstrating its desire to displace state law remedies. Congress made no such showing. Indeed, the legislative history suggests that Congress likely desired *not* to displace state law remedies. Accordingly, we hold that the COBRA provisions of the PHSA do not preempt state law.

### SANCTIONS FOR FAILURE TO FILE A DOCKETING STATEMENT IN TIMELY FASHION

Our circuit rules require an appellant to file a Civil Appeals Docketing Statement ("CADS") soon after filing a notice of appeal.

> [A]ppellant in each civil appeal shall complete and submit to the district court upon the filing of the notice of appeal an original and one copy of the Civil Appeals Docketing Statement on the form provided as Form 6, in the Appendix of Forms.... Appellant's failure to comply with this rule may result in dismissal

of the appeal in accordance with Circuit Rule 42–1.

9th Cir. R. 3–4.

 On January 27, 1999, we ordered the Radicis to file a CADS; they had not done so since the inception of the appeal. The Radicis did not comply with that order. On February 19, 1999, we again ordered the Radicis to file a CADS. The Order permitted the Radicis seven days to file an appropriate CADS. The Order stated that failure to file a CADS in timely fashion would result in sanctions.

The Radicis did not file a CADS until March 2, 1999—*twelve* days after the February 19, 1999, Order was filed. The Radicis note that the February 19, 1999, Order was served by mail, thereby permitting an additional three days' response time. *See* Fed. R.App. P. 26(c). But even Rule 26(c)'s three-day extension of time permitted the Radicis only ten days to respond, not twelve days.

The Radicis contend that any harm caused by untimely filing of a CADS was "de minimis." At the hearing, counsel explained that the delay had been caused by the geographical distance between the offices of the two lawyers representing the Radicis on appeal.[3] Counsel has not, in our opinion, explained sufficiently why delay was warranted. It bears repeating that counsel failed to meet the deadlines imposed by two separate Orders.

The February 19, 1999, Order specifically provided that failure to file a CADS in timely manner would result in dismissal. Although dismissal is expressly permitted as a sanction by our rules of practice, *see* 9th Cir. R. 42–1, we decline to dismiss the appeal because such a sanction appears harsher than necessary. During the hearing, Appellees' counsel conceded that Appellants' delay in filing a CADS did not prejudice or harm her clients' interests.

 Rule 42–1 provides that, "[i]n all instances of failure to prosecute an appeal to hearing as required, the Court may take such other action as it deems appropriate, including imposition of disciplinary and monetary sanctions on those responsible for prosecution of the appeal." 9th Cir. R. 42–1. Counsel's failure to file a CADS in timely manner constitutes a "failure to prosecute an appeal to hearing as required." *Id.*

Our prior cases have imposed monetary sanctions on counsel for violations of similar magnitude. We find that monetary sanctions are also appropriate in this instance. Counsel for the appellant personally shall pay a sanction of $500 to the Circuit Clerk.

We REVERSE the decision of the District of Nevada dismissing the Radicis' state law claims on preemption grounds and REMAND the case for further proceedings consistent with this opinion.

---

**3.** One lawyer practices in Arlington, Virginia, while the other practices in Las Vegas, Nevada.