In the Matter of NIAGARA MOHAWK POWER CORPORATION, Appellant, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK et al., Respondents, and PENNTECH PAPERS, INC., Intervenor-Respondent.

Third Department, June 16, 1988

## APPEARANCES OF COUNSEL

*LeBoeuf, Lamb, Leiby & MacRae (Jeffrey W. Meyers* of counsel), and *Gary J. Lavine,* for appellant.

*Robert A. Simpson (Kathryn C. Brown* of counsel), for Public Service Commission of the State of New York, respondent.

*Cohen & Dax (Jeffrey C. Cohen* of counsel), for Shawmut Engineering Company, Inc., respondent.

*Wickwire, Gavin & Gibbs, P. C. (Michael Kessler* of counsel),

and *Roland & Fogel (Usher Fogel* of counsel), for intervenor-respondent.

## OPINION OF THE COURT

YESAWICH, JR., J.

Section 210 of the Public Utility Regulatory Policies Act of 1978 (hereinafter PURPA) (16 USC § 824a-3) was enacted to foster the development of cogeneration and small power production facilities and thereby reduce this country's dependence on fossil fuels *(see generally, Matter of Consolidated Edison Co. v Public Serv. Commn.,* 63 NY2d 424, 431, *appeal dismissed* 470 US 1075) by, *inter alia,* authorizing the Federal Energy Regulatory Commission (hereinafter FERC) to prescribe rules requiring electric utilities to purchase electric energy from such facilities *(see,* 16 USC § 824a-3 [a] [2]). Similarly, Public Service Law § 66-c encourages the development of alternative energy sources by directing respondent Public Service Commission (hereinafter PSC) to enjoin electric corporations to purchase or transmit electricity from such alternative energy production facilities, with the additional stimulus of a 6 cent per kilowatt hour minimum sales price.*

Respondent Shawmut Engineering Company, Inc. proposed construction of a 17-megawatt waste-to-energy facility in Erie, Pennsylvania, which qualifies for the above-noted mandatory power sales. In December 1984, Shawmut initiated negotiations with petitioner for the purpose of effecting an agreement by which petitioner would purchase its electricity output. PSC initially approved a 15-year contract which priced electricity based upon petitioner's estimated long-run avoided costs (i.e., the amount it would cost petitioner to generate the energy had the purchase not been made) contingent upon Shawmut demonstrating that it could "wheel" (transmit electricity through intervening utilities' transmission facilities) its power to petitioner. Almost immediately thereafter, petitioner sought to have PSC recalculate its avoided costs to reflect a drop in oil prices and lower than expected inflation. PSC granted this petition in substantial part except that the "settlement rates" (that is, the estimate of petitioner's long-

---

* It should be noted that although FERC issued a decision on April 14, 1988 holding that States may no longer impose a rate exceeding avoided cost on purchase of power, this appeal is not affected because the application of the ruling is prospective only (1988 FERC Order on Petition for Declaratory Order, No. EL87-53-000, at 23) *(see, Matter of Long Is. Light. Co. v Public Serv. Commn.,* 137 AD2d 205, 209).

run avoided costs agreed upon by petitioner and parties interested in entering into long-term contracts for supplying on-site generation capacity, which had previously been endorsed by PSC) would still apply to certain hydroelectric facilities and all prior contracts and orders.

On April 9, 1986, PSC approved an agreement between Shawmut and petitioner incorporating the settlement rates, on condition that Shawmut's facility be in service by December 31, 1987. Failure to meet that deadline would subject Shawmut to the new and lower rates established in PSC's Opinion No. 86-8, rendered March 27, 1986, wherein PSC adopted long-run avoided cost estimates for the major utilities in New York and also set forth several standardized contract options under which independent power producers would be entitled to enter into long-term contracts with utilities such as petitioner. Because its financing was based upon the higher settlement rates—it had spent over $2.6 million on the design and permitting process, incurred $900,000 in closing costs, and obtained $70 million in tax-exempt bond proceeds, all in reliance on those rates—Shawmut petitioned for rescission of the 1987 commencement date, which it could not meet. In the alternative, Shawmut proposed a doubling of the contract period to 30 years, during the first 15 of which the settlement rates would apply with a 6 cent per kilowatt hour minimum (see, Public Service Law § 66-c); during the second 15 years the rates would be reduced to pay down the amount by which the settlement rates resulted in an overpayment (estimated by PSC at $132 million) when compared to the new rates in Opinion No. 86-8, plus interest, until the overpayment was reconciled, at which point Shawmut would deliver electricity at 95% of petitioner's actual avoided costs for the remainder of the 30-year period. By order dated September 3, 1986, PSC directed petitioner to enter into a contract with Shawmut spanning 30 years, with above avoided cost payments for 15 years based upon the original contract but including the statutory 6 cent minimum rate, a cap on overpayment and provisions for repayment. The loan implicit in the front-loaded payments was to be secured by an equity interest in the plant to petitioner, together with a right to operate it to effect repayment. Failure by Shawmut to obtain a wheeling agreement for the second 15-year period of the contract would trigger a default on the advance payments made by petitioner. Petitioner applied for a rehearing, which PSC subsequently denied, and in the meantime, petitioner, under protest, sub-

mitted a contract largely conforming to PSC's order which was ultimately approved.

■■■ Petitioner commenced this CPLR article 78 proceeding challenging PSC's denial of its rehearing application and the underlying order itself on the grounds that PSC (1) acted arbitrarily in approving modifications to the contract, (2) violated the State Environmental Quality Review Act (hereinafter SEQRA) (ECL 8-0109), and (3) unlawfully extended the benefits of Public Service Law § 66-c to an out-of-State facility. Penntech Papers, Inc. was granted leave to intervene as a party respondent. Supreme Court dismissed the petition (137 Misc 2d 235) and petitioner appeals; we affirm.

■ PSC is charged with acting arbitrarily because it provided Shawmut with a contract substantially more favorable than the standard options contained in its Opinion No. 86-8 without explaining the "special circumstances" that justify the unique and arguably preferential treatment accorded Shawmut. However, in that very opinion, PSC acknowledged that "standard terms cannot practically be tailored to meet the needs of every potential developer". It is clear from the record that the Shawmut project entails a significant amount of risk, and PSC, in carrying out the mandate of Public Service Law § 66-c to encourage development of alternative energy production facilities, determined that the propagation of the technology to be utilized at the Shawmut plant—the first of its kind to be used in this country—warrants the individualized treatment needed to get such a project off the blackboard and into production.

As noted by PSC, if this project is successful, ratepayers will benefit in the future from cheaper electricity that will more than offset the above avoided-costs rates paid during the first half of the contract, in addition to having a new and innovative garbage-to-energy domestic power supply technology. Furthermore, PSC's authorization of front-loaded pricing contracts of the type employed here are not uncommon in the case of hydroelectric facilities. That PSC is keenly aware that front-loaded contracts subject the purchaser, ultimately ratepayers, to the peril that the facility may never be capable of producing electricity at rates less than or equal to avoided costs is apparent from the agreement PSC ordered petitioner to enter into, for it capped the extent of the advanced payment to an amount equal to the asset value of the Shawmut facility and also gave petitioner a security interest in the plant with the option of possessing and operating it until

repayment was accomplished. Petitioner's dissatisfaction with the adequacy of its repayment security, though understandable, does not, as Supreme Court observed, warrant a court substituting its judgment for that of the agency, where, as here, it has not been shown that the manner in which PSC exercised its judgment was irrational (see, Matter of New York State Council of Retail Merchants v Public Serv. Commn., 45 NY2d 661, 672). Like petitioner, we too would have preferred that PSC more thoroughly spelled out the calculus it employed in making a determination that a particular facility should be granted special contract terms so that affected individuals can plan and negotiate accordingly (see, Matter of Health Related Nutrition Servs. [Roberts], 123 AD2d 466, 467), but since its decision in this instance is not so cryptic or conclusory that the basis of its determination cannot be discerned (cf., Matter of Long Is. Light. Co. v Public Serv. Commn., 137 AD2d 205, 211; Matter of Long Is. Light. Co. v Public Serv. Commn., 134 AD2d 135, 149), judicial intervention is inappropriate.

■ Similarly unpersuasive is petitioner's contention that PSC may not extend the benefit of the 6 cent per kilowatt hour minimum rate provided for in Public Service Law § 66-c to out-of-State facilities. Significantly, the language of the statute empowering PSC to compel "any" electric utility to purchase energy from "any" alternative energy production facility does not contain an express geographic limitation. While petitioner urges that because "any" electric utility must refer only to utilities over which PSC exercises jurisdiction, "any" alternative energy production facility necessarily means one within New York, we find it more plausible to read the statute as applying to "any" entity providing energy to New York ratepayers. This interpretation is in keeping with the declared purpose of the legislation, namely, to decrease dependence upon traditional fuels and not, as petitioner suggests, to promote in-State utilities to the exclusion of out-of-State utilities. Indeed, the latter approach may well violate the Commerce Clause of the US Constitution (US Const, art I, § 8 [3]; see, Philadelphia v New Jersey, 437 US 617, 626-627).

■ Finally, petitioner maintains that PSC failed to comply with SEQRA and its own policies on environmental analysis by ordering a contract modification without first demanding an environmental impact statement. Parenthetically, we note that PSC's challenge to petitioner's standing to advance this argument has considerable merit but was not raised in the

first instance and hence was waived *(see, Matter of Fosella v Dinkins,* 66 NY2d 162, 167). Instead, PSC proceeded to the merits and quite correctly concluded that approval of a contract to purchase electricity is not an "action" as defined in ECL 8-0105 (4). This approval is neither a permit to construct nor funding of the Shawmut facility *(see,* ECL 8-0105 [4]; 6 NYCRR 617.2 [b]). Although approval of an acceptable contract was undoubtedly integral to the acquisition of financing for the Shawmut facility, such a contention is too attenuated from the actual financing to be considered an action within the meaning of SEQRA. We find no merit in petitioner's remaining contention that PSC did not follow its own environmental review requirements.

CASEY, J. P., WEISS, LEVINE and MERCURE, JJ., concur.

Judgment affirmed, with one bill of costs.