**KAMINE/BESICORP ALLEGANY L.P., Plaintiff,**

v.

**ROCHESTER GAS & ELECTRIC CORP., Defendant.**

No. 95–CV–6045L.

United States District Court, W.D. New York.

March 20, 1995.

Douglas A. Foss, Harris, Beach & Wilcox, Rochester, NY, Anthony R. Palermo, Hodgson, Russ, Andrews, Woods & Goodyear, Rochester, NY, William A. Escobar, Alan R. Kusinitz, Kelley Drye and Warren, New York City, for plaintiff.

John Stuart Smith, David M. Schraver, Flor M. Colon, Nixon, Hargrave, Devans & Doyle, LLP, Rochester, NY, for defendant.

## DECISION AND ORDER

LARIMER, District Judge.

The dispute in this case centers on a 1990 contract that was—to a great degree—forced upon defendant, Rochester Gas and Electric Corporation ("RG & E"), a very unwilling and reluctant suitor. The contract was compelled by both federal and state law concerning the production of alternative energy sources.

As Shakespeare said of forced marriages, however, this forced contractual union has so far produced little but "discord and continual strife."[1] This lawsuit is but one more episode in this stormy relationship. It most likely will not be the last. But, as will be discussed, infra, regardless of how the "marriage" came about, it is not easily forsaken.

Plaintiff, Kamine/Besicorp Allegany L.P. ("Kamine"), commenced this action for damages and injunctive relief against defendant RG & E. Kamine asserts causes of action under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

Kamine is a limited partnership which is engaged in the private production of wholesale electric power. Kamine has developed and owns a cogeneration plant ("the plant") in Hume, New York. A cogeneration plant is a facility which produces both electric energy and steam or other forms of energy (such as heat) which are used for industrial, commercial, heating, or cooling purposes. 16 U.S.C. § 796.

RG & E is a public utility corporation that is engaged in the production, transmission, and distribution of electric power. RG & E provides electricity to retail customers in an exclusive, state-franchised area covering nine counties surrounding Rochester, New York.

In 1990, in conformity with the federal Public Utility Regulatory Policies Act, Kamine and RG & E entered into a detailed Power Purchase Agreement ("PPA") which obligated RG & E to purchase electric power from Kamine for twenty-five years. This Agreement was approved by the New York State Public Service Commission ("PSC").

In this action, Kamine alleges that RG & E has unlawfully refused to accept power from Kamine under the terms of the agreement, and that RG & E has thereby engaged in anticompetitive conduct aimed at preventing Kamine from entering and competing in the electric-power market.

Plaintiff has moved for a temporary restraining order ("TRO") and a preliminary injunction enjoining RG & E "from engaging in anticompetitive conduct." Plaintiff's Motion (Item 6). Specifically, Kamine asks the court to order RG & E to comply with the terms of the PPA.

The court heard oral argument on the TRO application on March 10, 1995. After reviewing the record and considering the parties' arguments, I conclude that the motion should be granted. Kamine has shown that it is threatened with imminent, irreparable harm if the Court does not issue a TRO. In addition, the balance of the hardships on this application tips decidedly in Kamine's favor, and the issues raised in the complaint establish a number of serious questions which present a fair ground for litigation.

Before discussing Kamine's application in detail, however, the Court notes that the following decision is not meant to minimize the significant issues surrounding the contract dispute (which, as explained infra, is currently being litigated in state court). As will shortly be explained at greater length, RG & E contends that the contract has been breached in several respects and that to enforce the contract as it is currently written will cost RG & E (and ultimately its customers) millions of dollars, because the prices set in the contract are far higher than the prices that RG & E would pay if it were allowed to purchase the same amount of power from other suppliers on the open market. Even Kamine acknowledges that the current market price of power for utilities such as RG & E is drastically lower than anyone anticipat-

---

1. "For what is wedlock forced, but a hell, An age of discord and continual strife?"

William Shakespeare, King Henry the Sixth, Part I, Act V, scene V, line 62.

ed during the time when this contract was formulated.

Some modifications over time were expected, but it appears doubtful that the parties ever anticipated changes of this magnitude. Whether these drastic, changed circumstances compel some rescission or reformation of the contract is a matter not before this Court at this time. What is before this Court now is RG & E's apparent attempt to unilaterally walk away from this contract without prior approval of the PSC or a court.[2]

## BACKGROUND

### I. Statutory Framework

An understanding of the facts of this case requires some explanation of the statutes and regulations that control the relationship between a private producer such as Kamine and a public utility corporation such as RG & E.

In 1978, in response to a nationwide energy crisis, Congress enacted the Public Utility Regulatory Policies Act ("PURPA"), 16 U.S.C. § 823a *et seq.*, as an amendment to the Federal Power Act, 16 U.S.C. § 791a *et seq.*. One of the aims of PURPA was to encourage the development of alternative and more efficient energy sources. In furtherance of that objective, PURPA directs the Federal Energy Regulatory Commission ("FERC") to promulgate rules and regulations requiring public utilities (such as RG & E) to buy electric energy from, and to sell electric energy to, qualifying cogeneration facilities. 16 U.S.C. § 824a–3. A qualifying facility ("QF") is one which meets certain standards set by FERC regarding matters such as size, fuel use, and efficiency. 16 U.S.C. § 796(18)(B). Congress also directed state regulatory authorities to implement FERC's rules and regulations. *Id.*

It is clear that Congress was also concerned about limiting the cost of electricity to consumers. Therefore, PURPA provides that no rule requiring a utility to purchase energy from a QF "shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a–3(b). "Incremental cost of alternative electric energy," which is commonly referred to as the utility's "avoided cost" is defined as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a–3(d); 18 C.F.R. § 292.101(b)(6).

FERC regulations provide guidelines for establishing rates and for determining avoided costs. 18 C.F.R. § 292.304. As stated, these regulations are to be implemented by the states through their appropriate regulatory authorities, which in New York is the PSC.

Pursuant to PURPA, New York enacted Public Service Law § 66–c, which directs the PSC to require any electric corporation to enter into long-term contracts to purchase electricity from a cogeneration facility under such rates, terms and conditions as the PSC finds to be just and economically reasonable. Pub.Serv.L. § 66–c(1). In 1990, at the time that Kamine and RG & E entered into the PPA, the statute also set a minimum sales price for purchased electricity of six cents per kilowatt hour ("KWH"). Pub.Serv.L. § 66–c(2).

### II. Factual and Procedural Background

Kamine first approached RG & E in 1988 with a proposal for an agreement for the sale of power from a plant which Kamine proposed to build in RG & E's territory.[3] Under PURPA, RG & E was *required* to negoti-

---

**2.** In view of the PSC's suggestion in its Order of July 15, 1994 that the parties negotiate their differences and in view of the course this litigation has taken in both federal and state court, and in considering the obvious risks to both the parties and RG & E's ratepayers, it would seem prudent for both sides to direct their efforts toward some long-term resolution of this matter rather than to continue to wage an all-or-nothing battle.

**3.** At that time, the proposal was actually made by Allegany Cogeneration, Inc. Allegany assigned the PPA to Kamine in 1992. Complaint ¶ 22. For the sake of convenience, both Allegany and Kamine will be referred to as "Kamine" throughout this decision.

ate with Kamine to purchase Kamine's power. 18 C.F.R. § 292.303(a). When initial negotiations proved fruitless, Kamine petitioned the PSC to order RG & E to negotiate. The PSC did so, and appointed an administrative law judge to supervise the negotiations.

A number of issues were disputed during the negotiations. These will be addressed as necessary below. At this point, it suffices to say that the parties did enter into an agreement in July 1990, and that the PSC approved the PPA in October 1990.

Because of Kamine's financing needs for the project, the payment structure governing RG & E's purchases was "front-loaded," meaning that during the early part of the contract term, RG & E would pay specific amounts representing a relatively greater percentage of the total purchase price, to be offset later in the term. Kamine would use these earlier payments to repay its lender.

Payment amounts are determined by reference to the PPA's division of the contract term into three periods. The length of these periods depends in part on the balance in an "adjustment account." The adjustment account is simply a tally of the total difference between RG & E's actual payments to date and what the total would have been had RG & E purchased the same power at its avoided cost. In other words, the adjustment account measures the difference between what RG & E paid under the PPA and what it would have paid had it not entered into the PPA. If the rates charged under the PPA exceed RG & E's avoided cost, the adjustment account will show a positive balance. A positive balance reflects an "overpayment" for this energy by RG & E.

The PPA provides that the first period of the term will commence on the date that the plant commences commercial operation until the balance in the adjustment account reaches zero. PPA Art. V(a). "Commercial operation" begins when Kamine has successfully completed certain tests of the plant, synchronized the plant with RG & E's electrical system, and first delivered electricity to RG & E for purposes other than start-up or testing. PPA Art. II.

The second period begins when the adjustment account reaches zero and lasts until the end of the fifteenth year of commercial operation. The third period then begins and lasts until the end of the twenty-five-year contract term. PPA Art. V(a).

Nothing guarantees that the adjustment account will ever reach zero, however. Depending on the differences between the PPA rates and the avoided cost, the adjustment account could reflect a negative or positive balance throughout the term. In that event, the first period would last until the end of the entire twenty-five year term. Also, if the account balance reaches zero for the first time after the fifteenth year of the contract, the second period would never occur; the first period would give way to the "third" period.

As stated, determination of the adjustment account balance requires reference to RG & E's avoided cost. For the first period, the PPA sets out in advance what the avoided cost will be for the years 1990 through 2008. PPA Art. V(a) and Ex. D. Those costs were based on estimates of long-range avoided costs ("LRACs") that had been approved by the PSC in 1988. These LRACs were simply the PSC's predictions of future avoided costs through the year 2008. The LRACs went up every year, from 3.7 cents per KWH in 1990 to 13.4 cents in 2008. At the time the PPA was approved in 1990, all of the parties anticipated that the LRACs were reasonably accurate predictions of future avoided costs. But, in any event, because the PSC had sanctioned these predictions, the parties had little choice but to use the 1988 LRACs when negotiating this type of contract which involved predicting future costs.

During the second and third periods, the avoided cost was deemed to be the cost set forth in a document known as Service Classification Number 5 ("SC5"). PPA Art. V(a). This is a tariff filed by RG & E and approved by the PSC that is applicable to payments made by RG & E for electricity from suppliers under the terms of the tariff. Unlike an estimate of future avoided costs, then, the SC5 rate would reflect RG & E's actual avoided cost.

Both the parties and the PSC realized that the LRACs, since they were only predictions of future costs, might turn out to be either greater or lower than actual avoided costs. The pricing structure was therefore designed to ensure that over the entire term of the PPA, RG & E's actual cost for power purchased under the PPA would not exceed its actual avoided cost. The scheme by which this was to be achieved was as follows. For any electricity purchased prior to the commencement of commercial operation (*e.g.* for testing purposes), RG & E would pay its actual avoided cost. During the first period of commercial operation, RG & E would pay $.06 per KWH, which at the time, by statute, was the minimum price RG & E could pay to independent producers such as Kamine. The Pub.Serv.L. § 66–c(2). During the second period, RG & E would pay 95% of its avoided cost as set forth in the 1988 LRACs. PPA Art. V(b). During the third period, RG & E would pay 90% of its SC5 avoided cost, with certain adjustments.

If there was a positive balance in the adjustment account at the start of the fifteenth year, that balance would be used to offset RG & E's payments. If there was a negative balance, RG & E would add to its payments. In no event, however, could the payments be less than 80%, or more than 120%, of the avoided cost.

At the end of the third period, *i.e.*, at the end of the PPA term, any remaining balance in the adjustment account would be paid in a lump sum by the appropriate party. If the balance were negative, RG & E would pay Kamine; if the balance were positive, Kamine would pay RG & E.

Under these terms, then, any given payment by RG & E might exceed its actual avoided cost at that time, particularly during the early part of the term. The parties obviously anticipated that there might be fluctuations in RG & E's actual costs and in the contract payment requirements, but the contract was structured to rectify those deviations over time. In the long run RG & E would recoup those overpayments, both through offsets in the third period and if necessary, through the final lump-sum payment by Kamine.

During the negotiations over the PPA, RG & E was concerned about security for any positive balances that might accrue in the adjustment account. RG & E was particularly apprehensive about the possibility that the positive balance might come to exceed the value of the entire plant. In spite of RG & E's request, the PSC did not require that Kamine post successive bonds for any overpayments during the contract term. There is a security requirement concerning obtaining a letter of credit but that requirement does not become operable until the thirteenth year of operation under the PPA. At the start of the thirteenth year of the PPA, Kamine is to obtain and deliver to RG & E a letter of credit securing its obligation to pay any positive balance which is projected to exist at the end of the PPA term. If the letter of credit expires before the end of the PPA term, Kamine must obtain a replacement for it, and continue to do so throughout the duration of the PPA. The amount of each letter of credit is to be the positive balance projected to·remain in the adjustment account at the end of the PPA. If the parties cannot agree on that amount, the matter will be submitted to arbitration. PPA Ex. B, § B(6).

This thirteen-year delay in obtaining a letter of credit is at the heart of the dispute between the parties. RG & E contends, quite simply, that the present payment schedule exceeds RG & E's actual costs to such an extent that the positive adjustment balance at the end of the thirteenth year of the contract will be so large—RG & E estimates it to be over four hundred million dollars—that Kamine will be unable or unwilling to obtain a letter of credit and will simply default on its obligations, leaving RG & E, and its ratepayers, with no means to. collect the sizeable overpayments.

At least four years after the parties had entered into the PPA, but before Kamine was ready to begin commercial operation, various matters arose which perturbed RG & E, and which eventually led to its attempt to terminate the PPA. For one thing, actual energy costs were proving to be much lower than the 1988 LRACs which formed the basis of RG & E's avoided costs during part of the

contract term. The 1988 LRACs eventually came to exceed actual avoided costs to such an extent that in 1991, the PSC withdrew them on the ground that they had been "overstated." In 1992 the PSC issued new LRACs, which were much lower than the ones utilized in the PPA. That same year, the state Legislature repealed the six-cent minimum for contracts entered into after June 26, 1992 (1992 N.Y.Laws ch. 519); contracts that had already been executed were unaffected by the repeal.

Another problem concerned the capacity of the plant. In January 1994, RG & E management discovered electrical diagrams that Kamine had submitted to RG & E field personnel in July and December 1993. These diagrams allegedly indicated that the plant would have a capacity of roughly 66 megawatts ("MW") to 79 MW, not the 55 MW specified in the PPA. Allegedly, this could force RG & E to purchase more power from Kamine than anticipated.

In February 1994, RG & E wrote to Kamine demanding an explanation for this apparent increase in capacity, and threatening to terminate the PPA if one was not forthcoming. Kamine responded, but, dissatisfied with the response, RG & E sent Kamine a letter on March 14, 1994, notifying Kamine that RG & E was "terminating" the PPA.

Kamine then petitioned the PSC to order RG & E not to terminate the PPA. RG & E filed a cross-petition seeking approval for the termination. On September 15, 1994, the PSC issued an order denying both petitions. Although the PPA provided for PSC arbitration of disputes over the PPA, the PSC stated that "we will not decide breach of contract questions, and the parties may not, by contract, expand or diminish our jurisdiction. Instead, the parties are advised to negotiate the differences between them, with resort to the courts if negotiations fail."

On September 7, 1994, RG & E filed an action in the New York State Supreme Court for Monroe County. RG & E seeks rescission or reformation of the PPA, premised on a number of contract-law theories. RG & E's claims for rescission are based on various alleged breaches of the PPA by Kamine, including the alleged increase in the generating capacity of the plant.

In the alternative, RG & E seeks reformation of the PPA based on the effects of the PPA's use of the 1988 LRACs. RG & E alleges that as a result of the unforeseen drop in actual avoided costs, the balance in the adjustment account is likely to grow to over $400 million by the thirteenth year of the PPA, when Kamine is supposed to obtain the letter of credit, and to over $700 million by the end of the twenty-fifth year. RG & E contends that Kamine will have neither an incentive nor the ability to secure or pay this obligation and will likely default.

During the Fall of 1994, construction of the plant was completed. Kamine ran various tests and supplied RG & E with test power, which was necessary before commercial operation could begin. On December 21, 1994, all the necessary tests were finished and Kamine was ready to begin commercial operation. The next day, RG & E sent Kamine another so-called termination letter stating that RG & E was terminating the PPA. RG & E recited the same reasons as those in its state-court complaint, and also added an assertion that Kamine would not be a QF when Kamine attempted to begin commercial operation. RG & E claimed that Kamine lacked a "thermal host," i.e., a buyer for its steam, which is a necessary condition to QF status.

RG & E has refused to accept power from Kamine at a cost greater than RG & E's actual avoided cost, which is much less than the PPA price. Kamine insists that it is entitled to sell power to RG & E at the full PPA price, and will not sell for less. As a result, Kamine has not sold any power to RG & E since completing the tests in December 1994.

In the state action, the parties have engaged in limited discovery, and Kamine's motion for summary judgment was denied by the Hon. Harold L. Galloway, Justice of the Monroe Supreme Court, on March 16, 1995.

Kamine filed its complaint in this Court on January 27, 1995. It moved for a preliminary injunction on January 31.

## DISCUSSION

*TRO Standards*

■ The standards applicable to a TRO application are similar to those applied to a motion for a preliminary injunction. A party seeking a TRO "must demonstrate irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions on the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the moving party's favor." *Towers Financial Corp. v. Dun & Bradstreet, Inc.*, 803 F.Supp. 820, 822 (S.D.N.Y.1992) (citing *Local 1814 Int'l Longshoremen's Assoc. AFL–CIO v. New York Shipping Assoc., Inc.*, 965 F.2d 1224, 1228 (2d Cir.1992); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990)). Likelihood of success means only that the probability of success is more than fifty percent. *Abdul Wali v. Coughlin*, 754 F.2d 1015 (2d Cir.1985).

■ "The purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1125 (2d Cir.1989) (quoting *Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n*, 306 F.2d 840, 842–43 (2d Cir.1962)).

■ The showings required to establish harm and the likelihood of success on the merits are to some extent inversely proportional to each other. Thus, "when the injury that allegedly will result if the restraining order is denied is very grave, less of a showing [of likely success] by the applicant is required than if the injury would be slight." 11 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2951 at 508–09 (1973 ed.).

■ It is clear, then, that if the balance of hardships tips decidedly toward the movant, the movant need not demonstrate a likelihood of success on the merits; "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for

more deliberate investigation." *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 442 (2d Cir.1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir.1953)).

*Irreparable Harm*

■ On the record before me, I find that issuance of a TRO is warranted. Kamine is faced with imminent, irreparable injury, and has shown a reasonable probability of success on the merits. At the very least, the situation should be preserved long enough for the court to decide the motion for a preliminary injunction.

In order to finance construction of the plant, Kamine obtained loans totaling over $90 million from General Electric Capital Corporation ("GECC"). Under the terms of the financing agreements, the loans are due on March 31, 1995, at which time it was anticipated that the loans would be converted to a term loan with repayments over twelve years. McNamara Decl. ¶ 9. If Kamine is unable to obtain term financing by then, it will be in default. If the default is not cured within a five-day grace period, GECC will be able to foreclose on the entire loan.

Kamine states that unless RG & E begins purchasing power at the PPA price, Kamine will be unable to obtain term financing or even to cover its operating expenses. Thus, Kamine maintains that it is faced with foreclosure and the loss of its entire business.

I find that this is sufficient to show irreparable harm. "The destruction of a business has long been held to constitute the type of irreparable injury for which there is no adequate monetary remedy." *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F.Supp. 1087, 1105 (S.D.N.Y.1989).

I do not agree with RG & E's contention that the alleged harm is too speculative because GECC might not foreclose. Kamine has not alleged a mere possibility that it could be harmed at some as-yet undetermined time. As of April 6, when the grace period has expired, GECC will have the power to foreclose, and I do not believe that Kamine should have to wait until then to find

out what will happen, at which point it may be too late to avert the harm.

■ Furthermore, Kamine need not show that it absolutely will go out of business if the TRO motion is denied. "Major disruption of a business can be as harmful as termination, and a 'threat to the continued existence of a business can constitute irreparable injury.'" *Nemer Jeep–Eagle v. Jeep–Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir.1993) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 28–29 (2d Cir. 1978) (alteration in original), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979)). The court in *Nemer* held that the balance of equities tipped decidedly in the plaintiff's favor because if an injunction were granted, the defendant would suffer little harm compared to the plaintiff's loss of business if the injunction were denied.

■ The ability of a creditor to foreclose also can suffice to establish irreparable harm. In *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969 (2d Cir.1989), for example, the plaintiff alleged that its lenders could foreclose on certain loans if an injunction were not issued, and that foreclosure could force the plaintiff into bankruptcy. The court found that irreparable harm had been shown, since the plaintiff's lenders "could demand payment at any time and … 'bring down the whole house of cards'". *Id.* at 975.

*The Merits of Kamine's Action*

I also find that Kamine has established that there are sufficiently serious questions on the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in Kamine's favor.

"[T]he burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief. In such a case, the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation." *Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 692–93 (2d Cir.1973) (citations and emphasis

omitted) (quoting *Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969)).

As noted, Kamine is threatened with the loss of its business. In contrast, RG & E faces no such dire consequences if a TRO is issued. Although RG & E alleges that its ratepayers would be subject to an automatic increase of four percent in their electricity rates, that is plainly not as serious a consequence to RG & E as Kamine's possible bankruptcy is to Kamine. Furthermore, if in fact RG & E ultimately prevails on the merits, the harm to RG & E could likely be remedied. The parties are currently engaged in litigation over the PPA in state court. RG & E has not shown why, if it succeeds in that litigation, any overpayments made pursuant to this TRO (which will necessarily be of limited duration) could not be recouped as part of a reformed contract or other judgment in the state-court action, if the PPA is, in fact, rescinded or reformed.

An examination of the facts of this case and the applicable law demonstrates that there are serious questions going to the merits to make them a fair ground for litigation. There are several significant federal policies involved in this dispute which suggest, at the very least, that there are serious questions going to the merits. The significance of these matters, coupled with the serious potential harm to Kamine if RG & E is allowed to unilaterally avoid its obligations under the contract, compels the conclusion that at least pending a hearing on the preliminary injunction, a TRO should issue. While many of the facts have yet to be proved, there is evidence that RG & E has avoided its obligations to Kamine under both the PPA and PURPA, and that its actions in that regard could have the effect of undermining the Congressional policies declared in PURPA and of restraining competition within RG & E's territory.

*Policy Concerning QFs*

Federal policy clearly favors QFs such as Kamine. In order to advance the goals and purposes of PURPA, QFs are given very special encouragement and protection under the law. This is to allow these fledgling private producers in the energy market a

chance to survive in the face of large utilities that heretofore have been exclusive providers of energy. PURPA is designed so that utilities must purchase power from QFs whether they want to or not. 16 U.S.C. § 824a–3(a). By federal law, as administered by state agencies, utilities must deal with and buy power from independent producers like Kamine. The reluctance of utilities to be forced into this "marriage" is amply demonstrated by the record in this case. Kamine's every step in this process has been critically scrutinized and often challenged by RG & E.

The special treatment accorded to QFs extends to the rates that they charge as well. FERC regulations specifically provide that when a QF agrees

> [t]o provide energy . . . pursuant to a legally enforceable obligation for the delivery of energy . . . over a specified term, . . . the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:
>
>> (i) The avoided costs calculated at the time of delivery; or
>>
>> (ii) The avoided costs calculated at the time the obligation is incurred.

18 C.F.R. § 292.304(d)(2). Kamine chose the latter option, as was its right. Such "front-loaded" contracts are not unusual in this setting, and are often used precisely because they allow the QF to finance the construction and operation of the facility in the early years of the contract. *See, e.g., Indeck–Yerkes Energy v. PSC,* 164 A.D.2d 618, 620, 564 N.Y.S.2d 841 (3d Dep't 1991); *Niagara Mohawk Power Corp. v. PSC,* 138 A.D.2d 63, 67, 530 N.Y.S.2d 626 (3d Dep't 1988).

Such contracts have been upheld by the courts and by FERC notwithstanding the recognized risk that the prices set by the contract may at times exceed the utility's actual avoided costs. As the Ninth Circuit observed in *Independent Energy Producers Ass'n, Inc. v. California Pub. Util. Comm.,* 36 F.3d 848, 858 (9th Cir.1994), FERC "recognized that, at times, the avoided cost rate provided in the contract might be greater or less than the utility's current avoided costs but that certainty as to rate was important . . ." Similarly, in *Niagara Mohawk,* the Ap-

pellate Division stated that the "PSC is keenly aware that front-loaded contracts subject the purchaser, ultimately ratepayers, to the peril that the facility may never be capable of producing electricity at rates less than or equal to avoided costs . . ." 138 A.D.2d at 67, 530 N.Y.S.2d 626.

The reason for the approval of front-loaded contracts, in spite of this risk, is simple. By ensuring a predictable flow of income, such contracts encourage the development of alternative energy facilities that otherwise might never be built. That overriding public policy is the basis for providing such special treatment to QFs. In FERC's words:

> The Commission recognizes this possibility [that current avoided costs might be lower than the rates provided in the contracts] but is cognizant that in other cases, the required rate will turn out to be lower than the avoided cost at the time of purchase. . . . Many commentators have stressed the need for certainty with regard to return on investment in new technologies. The Commission agrees with these . . . arguments, and believes that, in the long run, "over estimations" and "under estimations" of avoided costs will balance out.

*Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of PURPA,* 45 Fed.Reg. 12214, 12224 (1980) (quoted in *Independent Energy Producers Ass'n,* 36 F.3d at 858).

Even when actual avoided costs turn out to be lower than those set in a PPA, then, the interests of financial predictability and the integrity of the parties' contract obligations may override the desire to keep the utility's costs down, at least for the short term. The Supreme Court of Oklahoma recognized this in *Smith Cogeneration, Inc. v. Corporation Comm'n,* 863 P.2d 1227 (Okla.1993), which was cited with approval by the Court of Appeals for the Third Circuit in *Freehold Cogeneration Associates, L.P. v. Board of Regulatory Comm'rs of the State of New Jersey,* 44 F.3d 1178 (3d Cir.1995). In *Smith,* the court struck down a rule of Oklahoma's Commission equivalent to New York's PSC, which required QFs and electrical utili-

ties to include in their PPAs a provision allowing reconsideration and modification by the commission of avoided costs after the contract had been agreed upon. The court held that reconsideration of long-term PPAs constituted state regulation of QFs that is prohibited under PURPA, and noted that "PURPA and FERC regulations seek to *prevent* reconsideration of such contracts." *Smith*, 863 P.2d at 1240 (quoted in *Freehold*, 44 F.3d at 1193) (emphasis added).

Similarly, the court in *Freehold* held that once a state regulatory commission had approved a PPA between a QF and a utility on the ground that the rates in the PPA were consistent with avoided cost, just, and reasonably and prudentially incurred, the commission was *preempted by federal law* from taking any action to reconsider its approval or to deny the passing on of those rates to the utility's consumers. 44 F.3d at 1194. The court noted that the facts in *Freehold* favored the QF even more strongly than they did in *Smith*, because unlike the cogenerator in *Smith*, the QF in *Freehold* already had a signed contract, just as Kamine does here. The only difference in the case at bar is that here it is the utility, not the state, that is seeking to amend the contract. To allow RG & E simply to terminate the contract unilaterally, before there has been any judicial resolution of the disputed contractual issues, however, seems no more justifiable than allowing the state regulation that was held to be prohibited in *Smith* and *Freehold*.

Of course, it is also true that PURPA was designed so that the long-term costs of energy bought from a QF will not exceed the buyer utility's actual avoided costs. 16 U.S.C. § 824a–3(b). The method of reconciling this goal with the desire for stability and predictability, however, is not to allow a utility to refuse to pay the PPA cost whenever that cost temporarily exceeds the actual avoided cost. Short-term recoupment of the temporary overpayments was not contemplated by the parties when they executed this twenty-five year contract. There was a mechanism put in place to adjust, over time, aberrations in payment. PPAs, including this one, often contain security provisions to guarantee recovery of the excess payments.

Both parties to such a contract have an interest in such security provisions since it is never certain upon execution of the contract which party will be required to provide reimbursement. No one can predict the future with precision. Here, the PPA requires Kamine to provide a letter of credit about halfway through the term. The PPA also provides that balances in the adjustment account will be used as offsets or additions to RG & E's payments during the last ten years of the PPA, and for any balance remaining at the end of the term to be paid by the appropriate party.

Admittedly, these security provisions were not as stringent as RG & E would have liked. RG & E unsuccessfully sought to have the PSC require Kamine to post more frequent letters of credit throughout the contract term.

The fact that the PSC denied that request, however, like the fact that RG & E's actual avoided costs are much lower than the PPA rates, does not mean that RG & E can take it upon itself to walk away from, or unilaterally amend, the PPA. To allow such an action would effectively destroy the certainty which is so crucial to these contracts and which PURPA seeks to promote.

In contending that it has legitimate business reasons for refusing to purchase power from Kamine, RG & E contends that it is relieved of its obligations under the PPA because Kamine is not a QF, and was not a QF in December 1994 when Kamine sought to begin commercial operations because it allegedly lacks a thermal host for its steam.

It does appear that Kamine initially had an agreement with a greenhouse which would have been the thermal host, but that deal fell through. Kamine contends that it has since reached an agreement with another host, and that it has met all the qualifications for QF status.

Although some of these facts are in dispute and cannot be fully resolved at this point, it at least appears that they too are a fair ground for litigation. While it is true that a facility must be qualifying to receive the benefits of PURPA, RG & E has not shown

that it can determine for itself whether Kamine is a QF.

FERC regulations provide two ways in which a facility can be a QF. One, sometimes called "self-qualifying," provides that a facility which meets certain criteria "is a qualifying facility," and that the owner or operator can simply notify FERC of that fact by providing certain documentation. 18 C.F.R. § 292.207(a).

The second method, which the regulations describe as an "optional procedure," is to apply for FERC certification. Under this method, the owner or operator of the facility can file an application with FERC for certification that the facility is a QF. 18 C.F.R. § 292.207(b). Within ninety days, FERC will issue an order granting or denying the petition. 18 C.F.R. § 292.207(b)(5). The regulations also provide that FERC may revoke the QF status of a previously-certified facility if the facility fails to comply with any of the statements contained in the application. 18 C.F.R. § 292.207(d)(1).

In the case at bar, Kamine applied for FERC certification. RG & E intervened and opposed the request. FERC granted Kamine's application on June 24, 1993. *See Kamine/Besicorp Allegany L.P.*, No. QF88–292–002, 63 F.E.R.C. ¶ 61,320.

Since FERC has certified Kamine as a QF, I do not believe that RG & E can now unilaterally decide that Kamine is not a QF. That is not RG & E's call to make. To do so would be contrary to "Congress's express intent that the Commission exercise exclusive authority over QF status determinations." *Independent Energy Producers Ass'n*, 36 F.3d at 853–54. *See also* H.R.Rep. No. 95–1750, 95th Cong., 2d Sess. 89 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7797, 7823 (FERC's "determination [that a facility is a QF] would also prevent such facility from being challenged concerning the application of such exemption to it").

RG & E argues that Kamine has admitted its lack of QF status in December 1994 because Kamine informed RG & E by letter dated December 29, 1994, that it could not meet its QF criteria. In that letter, Kamine stated that the greenhouse owner had refused to permit Kamine to hook up a steam pipeline, and that even if the pipeline were hooked up immediately, "the efficiency standards [for QFs] could not be met as the Plant is not capable of producing sufficient amounts of thermal energy during the remaining number of calendar days of 1994 ..." Kamine added that "[t]he suspension of the Plant's qualifying facility status ... is not anticipated to last beyond the 1994 calendar year." Def. Exhibit Book in Opposition to TRO, Ex. K.

As stated, Kamine alleges that it has since found a new thermal host and meets all the requirements for QF status. Kamine has also filed an application with FERC for waiver of its QF operating and efficiency standards for 1994. That application is currently pending.[4]

None of this, however, changes the previously-stated fact that "the authority to make QF status determinations resides exclusively with the Commission ..." *Independent Energy Producers Ass'n*, 36 F.3d at 855. If utilities were free to make those determinations on their own, it would give them enormous power over cogenerators, and a ready vehicle to preclude entry into the market by cogenerators like Kamine.

■ That does not mean that RG & E must take Kamine at its word, however. "[I]f ... a utility determines that a QF is no longer in compliance with federal efficiency standards, then the proper remedy is either to petition the Commission to decertify the

---

4. RG & E disputes Kamine's assertion that such waivers are routinely applied for and granted. I do not believe that the facts concerning the waiver application are essential to my decision on the TRO motion, and I will leave the resolution of those issues to FERC, which is the proper body to determine them in the first instance. I do note, however, that there is some support for Kamine's contention that such waivers are often granted based on such factors as: their limited duration; the fact that noncompliance was during the testing stage; and the fact that granting a waiver would fulfill PURPA's goal of encouraging cogeneration facilities. *KES Kingsburg, L.P., Small Power Production and Cogeneration Facilities*, No. QF86–155–003, 59 F.E.R.C. ¶ 62,279 (June 17, 1992); *Kalaeloa Partners, L.P., Small Power Production and Cogeneration Facilities*, No. QF89–198–001, 59 F.E.R.C. ¶ 62,111 (May 1, 1992).

QF or to seek a declaratory order that the facility is no longer a QF." *Id.* at 859.

### Remedies for Breach

The facts set forth above warrant issuance of a TRO. In addition, the terms of the PPA itself suggest that RG & E's actions purporting to "terminate" the contract ignore the specific terms of the contract relating to breaches of the contract and remedies provided for an alleged breach. RG & E has not presented any persuasive reason why it should be allowed, in effect, to modify the PPA unilaterally.

The PPA contains specific provisions that expressly deal with the parties' rights and obligations in the event of a breach.

Article XII(d) of the PPA states that upon a material breach by either party, the non-breaching party must notify the breaching party in writing. If the breaching party fails to cure the breach within thirty days, either party may bring the dispute to the PSC for resolution, subject to judicial review, *"and this Agreement shall not be terminated* by the party claiming the breach prior to such resolution by the Commission or, if the Commission declines to act, judicial review ..."

Article XII(b) deals with termination of the agreement if it is established that a party made a false material representation which influenced the other party's willingness to enter into the agreement. But, the determination as to whether a breach occurred is left to "the determination by the Commission ... subject to final judicial review." What this section does *not* allow is for one of the parties to unilaterally determine that there had been a breach and terminate the agreement.

Here, both parties sought PSC resolution of their dispute, and the PSC declined to act on the ground that the dispute was outside its jurisdiction. Under the terms of Article XII(d), then, the next step was not termination, but judicial review. In fact, that is exactly what RG & E did by filing the action in state court (albeit before the PSC has issued its order). Rather than await the Court's ruling, RG & E then went ahead and unilaterally terminated the PPA while the matter was still pending in state court.

Even assuming *arguendo* that Kamine has breached various terms of the PPA in exactly the manner alleged by RG & E, there does not appear to be any support in the PPA itself for RG & E to do what it has done, *i.e.,* to terminate the agreement.

### Antitrust Injury

RG & E also argues that Kamine has not shown a likelihood of success on its antitrust claims because RG & E and Kamine are not in "competition," and because the PPA is not the result of competitive bidding or otherwise related to competition. While the premises for this argument are true in some ways, RG & E's conclusions do not necessarily follow, and I remain convinced that Kamine has shown that its antitrust claims do present a fair ground for litigation.

In some senses, traditional utilities and QFs are not competitors. QFs sell to utilities, who in turn sell to retail users. Thus, their customer bases are different.

■ In a broader sense, however, it must be recognized that the ultimate effect of PURPA is to introduce new energy producers into the marketplace. FERC has "emphasized that 'a basic purpose of section 210 of PURPA [16 U.S.C. § 824a–3] is to provide a market for the electricity generated by small power producers and cogenerators ...'" *American Paper Inst. v. American Elec. Power Serv. Corp.,* 461 U.S. 402, 410, 103 S.Ct. 1921, 1926, 76 L.Ed.2d 22 (1983) (quoting 45 Fed.Reg. 12221 (1980)). While Congress's purpose was primarily to foster energy conservation rather than competition as such, the fact remains that PURPA tends to broaden the energy market as a whole. If traditional utilities were successful in excluding QFs, then, the long-range effect could be to reduce competition.

Congress also recognized when it enacted PURPA that "traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities." *FERC v. Mississippi,* 456 U.S. 742, 750, 102 S.Ct. 2126, 2132–33, 72 L.Ed.2d 532 (1982). It is not inconceivable, then, that traditional utilities like RG & E could try to prevent nontraditional facilities like Kamine from entering the market.

Moreover, the fact that RG & E and Kamine do not directly compete *with each other* does not mean that RG & E's actions cannot be anticompetitive. Some of Kamine's claims in this action are based on a monopsony theory, *i.e.,* that as the single buyer for wholesale power within its territory, RG & E is able to control the price that it will pay. If RG & E prevents Kamine from entering the market, there would be reduced competition among its energy suppliers.

*Payment Rate*

There remains the question of the rate that RG & E must pay for power purchased under the PPA. That depends in part on which of the three periods of the PPA is currently in effect. Under Article V of the PPA,

> The "First Period" shall consist of the period from the date the Plant commences Commercial Operation until the balance in the Adjustment Account first reaches zero. The "Second Period", if any, shall consist of the period between the end of the First Period and the end of the fifteenth (15th) year after the date upon which the Plant commences Commercial Operation.

The balance in the adjustment account is determined by reference to RG & E's avoided cost. The PPA states that the avoided cost during the first period is the "Avoided Cost as set forth on Exhibit D," which is a list of the 1988 LRACs through the year 2008. The avoided cost during the second period is RG & E's "actual cost of producing electricity (appropriately adjusted for losses) avoided by reason of this Agreement, as defined in Service Classification Number 5 (SC5)," the tariff filed by RG & E with the PSC.

During the first period, RG & E is to pay $.06 per KWH for electricity. During the second period, RG & E is to pay its "Avoided Cost as set forth on Exhibit D [the 1988 LRACs] multiplied by 95%." PPA Art. V(b).

The parties dispute whether Kamine ever commenced commercial operation, and thus whether the first period ever began. Kamine claims that it began commercial operation immediately after the final test was completed on December 21, 1994. RG & E alleges that one necessary test was never properly completed. The significance of this lies in RG & E's argument that if commercial operation begins for the first time now in 1995, Kamine will never be entitled to more than $.06 per KWH under the PPA. *See* Ruganis Aff. (RG & E Exhibit Book in Opposition to TRO Ex. A), ¶¶ 108–13.

I do not believe that this matter must be resolved at this time and in the context of this motion. Regardless of whether commercial operation began in 1994 or begins now, the parties would now be in the first period, and RG & E's initial payments would be at the six-cent rate. That is the rate that will be applied under this Order. Any further determination of whether and when the second period will begin is essentially a matter of contract interpretation, which is the subject of the action now in state court. That is the appropriate forum to resolve these rate disputes.

*Bond Request*

Rule 65(c) states that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Although the rule thus seems to require the posting of a bond for all TROs, a number of cases have held that the court's discretion to set the amount of the bond includes the discretion to waive the bond entirely. In particular, "the district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined." *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1356 (2d Cir.1974).

Similarly, in *United States v. Bedford Associates,* 618 F.2d 904 (2d Cir.1980), *cert. denied,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982), the court found no error in the district court's refusal to require a bond from a building owner, who was involved in a dispute with a government tenant over the provision of certain services for the building. The court noted that the parties had an ongoing relationship, and said that even if the government had been wrongfully

ordered to make certain rent and utility payments, it could recoup any excess payments out of future rents due. *Id.* at 917 n. 23. *See also Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624, 632 (2d Cir.1976) (no error in dispensing with filing of bond where no request for bond was made, and there was little likelihood of harm to enjoined parties under facts of the case); *Holborn Oil Trading Ltd. v. Interpetrol Bermuda Ltd.,* 658 F.Supp. 1205, 1211–12 (S.D.N.Y.1987) (no bond ordered since there was no demonstration of harm to defendant as result of injunction).

Here, it does not appear that RG & E would suffer any long-term harm if the TRO is later found to have been issued wrongfully. The only way that RG & E could be wrongfully harmed by the issuance of a TRO is if RG & E's contract claims are accepted and if it is determined that it should not be paying the full PPA price. The amount of such an "overpayment" during this purely temporary period of injunctive relief is unlikely to be so substantial that it could not be rectified at a later date. There is no reason to think, then, that RG & E could not recoup the amount of this potential overpayment in its state-court action, or by negotiation with Kamine.

Although my primary reason for imposing no bond in this case is the lack of harm to RG & E, I also note that the record indicates that Kamine is not in a position to post a bond in an amount that RG & E would consider satisfactory at this time. A party's ability to pay a bond has also been held relevant with respect to whether to require security. *See, e.g., Kulakowski v. Rochester Hosp. Serv. Corp.,* 779 F.Supp. 710, 717 (W.D.N.Y.1991); *La Plaza Defense League v. Kemp,* 742 F.Supp. 792, 807 n. 13 (S.D.N.Y. 1992).

It is true that these cases frequently involve indigent plaintiffs or public-interest lawsuits, situations not present here. It should be noted, though, that the whole purpose of the TRO in this case is to provide some cash flow to Kamine so that it may avert the loss of its business. Under these circumstances, it would seem anomalous to require it to post a substantial bond, and I therefore decline to do so.

## CONCLUSION

Plaintiff's motion for a temporary restraining order is granted. Defendant Rochester Gas and Electric Corporation is hereby enjoined from refusing to accept electric power from plaintiff under the terms of the Power Purchase Agreement between the parties that was approved by the New York Public Service Commission on October 31, 1990. Defendant is further enjoined from paying plaintiff less than six cents per kilowatt hour for electric power delivered to defendant by plaintiff pursuant to the Power Purchase Agreement.

This temporary restraining order shall expire ten (10) business days after its date of entry (Fed.R.Civ.P. 6[a]; 65[a] ), unless within that ten (10) days the Court extends its duration, or unless the parties stipulate to an extension.

IT IS SO ORDERED.